(40 South. 894.)

No. 15,735.

BRENNER et al. v. FORD.

(Jan. 2, 1906. Rehearing Denied Jan. 29, 1906.)

MASTER AND SERVANT—TORTS OF SERVANT—LIABILITY OF MASTER.

The son of the plaintiffs was killed by being run over by a horse and vehicle recklessly driven by a man in the employ of the defendants. Plaintiffs charged that the act was committed by the employé while engaged in the exercise of the functions in which he was employed. The employé was not engaged as a driver, but as a groom and stableman. Taking advantage of the absence of his employer from the city of Shreveport he, for his own pleasure, in disobedience of positive prohibitory orders given at the time of his employment and continued to be given thereafter, hitched the horse to a buggy and drove her, outside of and contrary to the terms of his employment. The employé could not possibly have made a mistake on that subject. Even had he believed that subsequent instructions justified him in driving the horse, his belief to that effect was not justified by the facts. The claim against the defendant is not well founded.

[Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Master and Servant, §§ 1217–1220, 1224.]

(Syllabus by the Court.)

Appeal from First Judicial District Court, Parish of Caddo; Thomas Fletcher Bell, Judge.

Action by Henry Brenner and others against John McW. Ford. Judgment for defendant, and plaintiffs appeal. Affirmed.

Alfred Dillingham Land, Jr., and Edgar Williamson Sutherlin, for appellants. Alexander & Wilkinson and Fullilove & Mills, for appellee.

### Statement of the Case.

NICHOLLS, J. This suit is brought by father and mother of a child claiming damages for its death. The action is based upon allegations that their son, Leon Brenner, aged seven years, was run over and killed while crossing Gary street in Shreveport, by a horse owned by the defendant, then being driven by the latter's driver. It is averred that their

son was guilty of no negligence whatever, but that same was due to the fact that the said servant of the said Ford was grossly and criminally negligent, and was not using due care and caution in driving the horse along the crowded streets of said city; that said horse was known by said Ford to be extremely nervous, high strung, and dangerous to drive, save by a person of great skill and discretion; that said Weeden, to the knowledge of said Ford, did not possess the skill necessary to drive and manage said animal properly; that had said Weeden been using due care and caution to avoid injury to pedestrians on said street, he would have avoided running over petitioner's child; that if he did not see said child it was because he was not using due watchfulness such as is necessary in driving through the streets of a city; that said horse was not driven on the said occasion with bit severe enough to enable a driver of Weeden's skill and experience to control him when necessary; that it was negligence on the part of said Ford to permit the use of such a bit on an animal as difficult to guide and control as was the horse in question; that said horse was in the charge and control of the said Weeden as Ford's servant, and with his permission, express or implied, from the fact that said Weeden was employed by said Ford to care for said animal and that said animal was under the control of said Weeden.

Petitioners represent that said horse and vehicle passed over their child, mashing and bruising his face and body, breaking his jaw, crushing his ribs, and generally injuring him so that after suffering great pain for several hours he died from effects thereof; that the right of action of their said child to recover damages for said pain and suffering has survived over to them; that they have expended $250 for medical attention to said child, and for funeral expenses; that in addition thereto they have been deprived of the affection and support of their child, have suffered great agony of mind by his loss, and have been damaged thereby in the full sum of $10,000.

In view of the premises petitioners pray that after due citation they have and recover judgment against the said Ford in the full sum of $10,250, with 5 per cent. per annum interest thereon for costs, and for general and equitable relief.

Defendant, after pleading the general issue, averred that the driver of said horse was not acting within the scope of his employment at the time of said accident, but, on the contrary, that he took said horse out of its stable in violation of the orders of defendant, and without his knowledge or consent; that said driver was not employed to drive said horse, and, without any right or consent to do so, had secretly taken said horse out on the day of the accident, contrary to the orders of defendant. That in any event the accident was caused by the negligence of plaintiff and his said child.

In view of the premises he prayed that plaintiff's demand be rejected at his cost, and for general relief.

The case was tried before a jury which rendered a verdict in favor of the defendant by a vote of 10 to 2, and plaintiff appealed.

### Opinion.

Plaintiff attributes the verdict returned by the jury to the refusal of the district judge to give to it the special charge which had been requested. The instruction refused to be given was as follows:

"I charge you that the test of the defendant's liability for the act of his servant is not as to whether or not he was disobeying instructions or discharging them in exercising the horse in that particular way [by driving it], but the true test is this: Was the servant engaged in discharging his duty to defendant as his employer, or was he simply acting for himself or in pursuit of his own personal objects? The facts that a servant exercises a horse in the one way that is forbidden him instead of the other ways that are permitted him will not release the master from responsibility for his negligence, pro-

vided that in so doing the servant was acting bona fide in the interest of his master, and not in the pursuit of his own affairs."

The judge's assigned reasons for his refusal were that he had already charged the jury that the liability of defendant depends on the fact "whether or not the driver was at the time of the accident acting in the sphere of his employment."

Plaintiffs say this refusal involved the very meat of the case. It practically withdrew from the jury the question of defendant's liability in the event the servant did the injury while exercising the horse for the master in the scope of his employment, but in violation of the manner in which he had been instructed to exercise it, and thereby their case was knocked down.

They quote from Rapalje & Mark's Digest, p. 63, No. 74, to the following effect:

"When a servant is engaged in accomplishing an end which is within the scope of his employment and while so engaged adopts means reasonably intended and directed to the end which result in injury to another, the master is answerable for the consequences regardless of the motives which induced the adoption of the means and this too even though the means employed are outside of his authority and against the express orders of the master."

They cite also Mitchell v. Cransweller, 13 C. B. 237; Quinn v. Power, 87 N. Y. 535, 41 Am. Rep. 392; Bowler v. O'Connell (Mass.) 38 N. E. 498, 27 L. R. A. 177, 44 Am. St. Rep. 359; Cooley on Torts (Ed. 1880) pp. 533 to 540; 1 Thompson on Negligence (Ed. 1901) § 519; Singer Manf. v. Rahn. Id. (C. C.) 26 Fed. 912, 132 U. S. 518, 522, 523, 10 Sup. Ct. 175, 33 L. Ed. 440; Phil. & Reading R. R. v. Derby, 14 How. 468, 14 L. Ed. 502; Story on Agency, § 452; Smith on Master & Servant, 452; Sleath v. Wilson, 9 Carr & Payne, 607; New Jersey Steamboat Co. v. Brockett, 121 U. S. 637 (645), 7 Sup. Ct. 1039, 30 L. Ed. 1049; Philadelphia R. R. v. Quigley, 21 How. 202 (210), 16 L. Ed. 73; Texas Pac. Ry. Co. v. Scoville, 62 Fed. 730, 10 C. C. A. 479, 27 L. Ed. 179; Lake Shore R. R. Co. v. Prentice, 147

U. S. 101 (109), 13 Sup. Ct. 261, 37 L. Ed. 97; 20 Am. & Eng. Ency. of Law (2d Ed.) pp. 165, 167, 168, 170; Shear & Redf. on Negligence, §§ 141, 146, 147, 148, 159, 160.

Plaintiff urges that the evidence establishes "that the defendant told the servant not to drive the horse and then told him to exercise her without limiting him to any specific method of exercising her and without telling him to exercise her only by leading or driving, would necessarily leave the servant under belief that he was to exercise her by driving her the only appropriate or expedient way in which she could be exercised at all, and the only way in which the horse was accustomed to be used. The doubt and uncertainty from defendant's statement as to what were his instructions were certainly calculated to leave and did leave the servant under the belief that he was to exercise the horse in the only way that such a horse could be adequately and appropriately exercised; that is by driving her."

The defendant on the other hand contends:

(1) That the master is not bound for the acts of the servant beyond the scope of his powers and in disobedience of his orders. Corporation of Minden v. Silverstein, 36 La. Ann. 916; Williams v. Pullman Car Co., 40 La. Ann. 87, 3 South. 631, 8 Am. St. Rep. 512; McDermott v. American Brewing Co., 105 La. 124, 29 South. 498, 52 L. R. A. 684, 83 Am. St. Rep. 225.

(2) Where a servant in the performance of his duties is not accustomed or authorized to use a horse or conveyance, and wrongfully takes the horse or conveyance belonging either to the master, or to some other person, and in thus performing his service causes injury, the master is not liable. Shelton v. Toronto, 13 Ont. 139; Wilson v. Penn. R. R. Co., 63 N. J. Law, 385, 43 Atl. 894, note 1; 20 Am. & Eng. Ency. of Law, p. 166. He cites, additionally, Ritchie v. Waller (Conn.) 28 Atl. 29, 27 L. R. A. 161, 38 Am. St.

Rep. 361, and Baltimore Consolidated R. Co. v. Pierce (Md.) 43 Atl. 940, 45 L. R. A. 527.

The article of the Civil Code upon a portion of which defendant relies to establish his nonliability for the death of plaintiff's son is article 2320 which declares that masters and employers are answerable for the damage occasioned by their servants and overseers in the exercise of the functions in which they are employed. Responsibility only attaches when the masters or employers might have prevented the act which caused the damage, and did not do so.

The first matter, therefore, to which we direct our attention in this case, is the ascertainment of what was the exact employment for which the defendant engaged John Weeden, the man who was driving defendant's horse at the time of the accident.

The testimony shows that the defendant at that time was living and had lived for a number of years before in the same house in Shreveport with Charles L. Gaines and his wife. He had, however, been away from the city for several weeks, and returned there only upon the very day of the accident. He had on that day no communication with Weeden. Gaines and Ford each owned a horse and buggy. The horse belonging to the latter was a nervous, spirited animal, but not vicious. Ford and the witness Gaines had built a stable on a lot of the latter, situated across an alley from the place where they lived, and in this stable they kept their horses. We copy some extracts from Gaines testimony.

"Q. Who employed this negro?
"A. I think Mr. Ford and myself together. He was sent to us by a negro that had previously been taking care of the horses. * * *
"Q. What did you employ him to do?
"A. To feed and curry the horses, and hitch them up.
"Q. Did you all employ him to drive the horses?
"A. No, sir.
"Q. What, if anything, was said as to his duties in driving the horses?
"A. I had cautioned him repeatedly, and Mr. Ford also cautioned him in my presence not to drive the horse, not to take them out unless we told him to do so.
"Q. You heard Mr. Ford tell him that?
"A. Yes, sir. I told Mr. Ford he had better caution him; both of the horses were inclined to be high spirited horses, and we prized them highly.
"Q. You had instructed him then not to drive the horses?
"A. Yes, sir.
"Q. He was employed to curry and feed the horses?
"A. Yes, sir, and hitch up and drive around from the stable to the front gate, and I think used to drive down to the bank (the place of business of the defendant) sometimes under instructions from Mr. Ford.
"Q. You usually kept your horses in the stable.
"A. Yes, sir.
"Q. What directions did you give the negro about turning the horses out in the lot for exercise?
"A. When Ford was here we would let them take turn night each; turn his horse out in the lot one night and mine the next; would not turn them in together. They were both shod and were liable to get to knocking and hurt one another. When Ford was going away, I told him I would see the negro left my horse in the stable and turn his mare out in the lot as my horse was being driven.
"Q. What was that for?
"A. So that his horse could play and get exercise.
"Q. Does that answer the purpose of exercising a horse to turn them out in a lot and let them run around?
"A. Yes, sir.
"Q. Did you hear Mr. Ford give the negro any instructions when he left?
"A. No, sir, not at the time he left.
"Q. You heard him before that tell him not to drive the horse?
"A. Yes, sir, and I told him. I told Ford if he was going to have his horse given any exercise he ought to have the negro to ride her.
"Q. She was a horse that was easily ridden.
"A. Yes, sir.
"Q. Did the negro ever ride her?
"A. I do not know whether he did or not. I know that the other negro that we had there before did, and my recollection is this negro was there only about a month or six weeks; the negro George that we had rode her frequently.
"Q. That was the way to exercise her?
"A. Yes, sir.
"Q. As far as you know had this negro driven the horse while Ford was away?
"A. Not that I know of.
"Q. If you had caught him driving her what would you have done. You knew Mr. Ford's intention in that regard?
"A. Yes, sir, I would have stopped him.
"Q. You knew that he had instructed the negro not to drive her?
"A. Yes, sir—instructed the negro not to

drive her except when told to. Sometimes he would telephone to the house and tell his sister or the one that answered the telephone to tell the boy to hitch up and drive down to the bank for him.

"Q. As I understand the negro was not employed as driver, but merely to feed, curry, and hitch up the horses?

"A. Mr. Ford nor I ever had any one employed to drive for us."

The defendant Ford, among other matters, testified as follows:

"Q. You employed him [John Weeden] for what purposes?

"A. To attend to the horses, curry them, feed them, and give them water, and turn them into the lot at night, and hitch up. I was working for Mr. McCutcheon at the bank at that time.

"Q. How about the driving of the horses; did he ever drive your horse?

"A. Not to my knowledge. He was instructed not to, further than to bring it down to me at the bank; when I wanted him to bring her down to the bank, I would telephone to the house just about time for him to get there by the time I was ready for her. I would telephone to the house, and tell them to tell him to hitch up and bring her down to the bank. I instructed him [Weeden], the day that I left here that I was going away for two weeks; to take care of the horses; I did not care for him to drive her; that she would get sufficiently exercised by being turned into the lot. I told him that I did not want him to drive her. I had told him before that not to drive her. I did not employ him for the purpose of driving that horse. I never allowed any one to drive my horse except Mr. Stephenson and Mr. Gaines."

On cross-examination, the witness said:

"When I left to be gone two weeks I told him [Weeden] that I did not care to have him drive her at all. I told him to see that she was properly cared for. I did not tell him to ride her, nor to lend her. I told him I did not want him to do anything further than take care of her. Witness on the trial of Weeden under an indictment for the murder of the child testified that he had testified that he had told the negro to exercise the horse, but not to drive her. He admitted to having so testified—to see that the horse got exercise. I told him to see that she had exercise while witness was gone. I told him not to drive her, but to see that she had exercise. Witness gave him no further instructions than that. The horse had nice gaits that I did not want ruined, and I did not care to. When witness told the negro to exercise her, he also told him not to drive her—to turn her out in the lot. Witness did not employ Weeden as a driver."

The position taken by the defendant is that at the time of the accident to plaintiff's child the negro Weeden, who was driving the horse attached to his buggy was (in so doing) acting outside of the terms of his employment. He maintains that availing himself of his right to determine and fix the scope of the duties of the employé, he had expressly "ab initio" withdrawn, and excluded from the servant the right and the duty of driving the horse except upon special orders given at the time, fixing and defining precisely what he was then to do; that in the absence of such affirmative special orders given to him at the time of his undertaking to drive the horse in doing so, he was acting entirely dehors his employment. He denies that this act of the negro was in disobedience of orders or instructions which were given to him as to the performance of duties which had devolved upon him in the discharge of his existing duties which left his acts to be tested and passed on as if such orders had not been given. He urges that the attempt of the plaintiffs to place matters on that footing is without justification and warrant; that the orders and instructions not to drive the horse was one of the original limitations which had been placed by himself upon the authority which he conferred upon the servant, and one of the conditions of his employment; that by disobeying such instructions, he could not extend and bring inside the sphere of his duties the thing which was prohibited, and which marked the scope and fixed the extent of the servant's employment.

Defendant insists that when the terms of the employment had been fixed, and by the same Weeden had been expressly prohibited (ab initio) from driving the horse, it could not be pretended (when he undertook afterwards to drive her) that he was doing so on the master's business, or for his interest. On the contrary, it must be conclusively presumed that he was driving the horse for his own pleasure.

Plaintiffs' claim that the defendant having told the servant not to drive the horse, and

then told him to exercise her without limiting him to any specific method of exercising her only by leading or riding, necessarily left the servant under the belief that he was to exercise her by driving as the only appropriate or expedient way in which she could be exercised at all, or the only way the horse was accustomed to be used.

We do not think the testimony justifies the taking of this position. Weeden was prohibited from the beginning from driving the animal, and that prohibition was never removed. On the contrary, it was continuously reiterated. Weeden could not possibly have made any mistake on that ' subject. Even had he made a mistake, it was one not justified by the facts.

We are satisfied from the evidence that Weeden was driving the defendant's horse in violation of his employment at the time of the killing of plaintiff's child, and that ' he was driving her for his own pleasure, and not in the discharge of any duty imposed upon him by his employment as a servant.

Under such circumstances, we think the verdict of the jury and the judgment therein rendered in favor of the defendant were justified by the facts.

The judgment appealed from is therefore affirmed.

LAND, J., takes no part, having presided below when defendant's servant was convicted of criminal negligence.