OVERTON, J.
This is a suit for $20,225, instituted by Tbomas G. Duffy and his wife, Willie Meigb Biggs, for damages for the death of their son, Thomas G. Duffy, Jr., aged about 11 years. The death was the result of an automobile accident at the intersection of Dryades and Terpsichore streets, in the city of New Orleans. The evidence is rather conflicting as to the speed at which the automobile that caused the accident was running at the time; as to whether its lights were burning, and even as to whether the automobile struck the boy on the lower or upper side of the intersection of Dryades and Terpsichore streets, but from the evidence, after carefully weighing it, we find the following to be the facts:
Defendant employed. Maurice Flemming, a boy, who, on the date of the accident, was only a few days past his seventeenth • birthday, as his chauffeur, to operate an automobile for hire. Flemming received a part of the earnings of the car he drove as his wages. He was given a stand near the corner of Gravier and St. Charles streets. At that point he secured a passenger, whom he drove to the corner Of Melpomene and Dryades streets. It was then between 7:30 and 8 .in the evening. As it was his supper time, and as he was only four blocks from his home, he started there to dine, intending to return to his stand immediately after dining, to go back to work. • When he start-for his supper, he was then one block the point of the accident. About that two boys, one the deceased, and the his companion, Raymond McGuire left news stand on the upper side of Dryades a few doors above Terpsichore, and down Dryades, crossed Terpsichore, started across Dryades, from the woods the river side, in the pathway for pedestrians. It was raining. McGuire was a few feet ahead of the deceased, and, see-some dark object coming rapidly up the cried to the deceased to run. Mcran, and in a moment turned around, saw the car as it struck the deceased, or immediately afterwards — it is difficult to say which, but probably the latter.
The car knocked the deceased down and dragged him across the intersection, near the neutral ground, in Dryades, on the upper side of Terpsichore street. At that point he was picked up by some man standing near by, before the chauffeur succeeded in reaching him, and carried to a drug store at the corner.
The automobile had no lights burning and was running at an excessive speed. There was a dim light at the corner at the time. The car was the one that had just left the corner of Melpomene and Dryades streets, and was being driven by Flemming, defendant’s chauffeur.
[1] Flemming testified that he was running only about eight miles an hour, and another witness five, but both the conductor on a passing street car and McGuire stated that he was running rapidly. As Flemming saw the child immediately before striking him, and knew that he had struck him, it would seem that, had he been running slowly, he could have stopped the automobile in time to have avoided dragging the child acrosé Terpsichore street. That he did so drag him is overwhelmingly established. Flemming testified that his brakes were in good condition, and that he applied them at once. We there *277 fore find that he was running at an excessive speed, at a crossing fór pedestrians, and this whether his automobile skidded across the street or not. Flemming said that he stopped within five feet, but this is clearly disproved.
Flemming also testified that his lights were burning, but both McGuire and the conductor, mentioned above, testified that they were not. Another witness testified that they were lit, but, the evidence of this witness is not entitled to much weight, for he stated that the boy was crossing, and was struck on the uptown side of Terpsichore street, instead of the downtown side, and was crossing from the river to the woods side, instead of from the woods to the river side. In this respect, at least, as to where the boy was struck, this witness contradicts Flemming, himself, who stated that his automobile struck the child on the downtown side.
There were two trials of this case, in the lower court, the first of which resulted in a ¡judgment for plaintiffs, and the second in a Judgment nonsuiting them. Defendant contends that there is a conflict between McGuire’s evidence on the first trial and his evidence on the second, but we fail to find a substantial conflict, or anything that suggests that he was telling an untruth on either occasion; nor do we find defendant’s contention sustained that the street ear conductor was not in position to say whether, under the circumstances, the lights were burning on the automobile.
[2] We therefore find that Flemming was negligent in running the automobile at an excessive speed, and in failing to have the lights on it burning; that this negligence was the proximate cause of the death of the deceased; and that there was a failure to show that the deceased, through any fault of his, contributed to the result. It was Flemming’s duty, when he approached the street crossing, to have had the automobile under full control, so that it could have been stopped quickly, in the event of an emergency, for it was a place at which people were constantly crossing; and he should have had its lights burning, so that they not only might have served as a warning to ■others that an automobile was approaching, but also have enabled him to have better discharged his duty in keeping a sharp lookout for pedestrians and vehicles. Had Flemming' been driving even slowly, it is more than likely that the accident would have been avoided, for, even as it was, the child almost succeeded in escaping.
In relation to the caution required in driving automobiles on the streets, we said in Mequet et al. v. Algiers Mfg. Co., Ltd., 147 La. 364, 84 South. 904, that—
“Automobile vehicles have become a very important and necessary part of the business and social life of the people, and, in view of their advantages and benefits, are permitted to operate upon the public streets and highways, though carrying with them great potential possibilities of danger and destruction. Society, therefore, in conceding them the right to operate, exacts of those taking their advantages a .high degree of care in avoiding the known evil results which follow a different course. On those portions of the highways, known to be used by such vehicles, between the points provided for the passage of pedestrians, the latter, in attempting to cross, do so in a large measure at their peril, subject to the requirement that the drivers of such vehicles shall not knowingly or wantonly strike and injure them. But at the points provided for the passage of pedestrians they have the right to assume that the operators of such machines will observe that high degree of care imposed by the circumstances.”
[3] Defendant, however, urges that, even if the accident were .due to the negligence of Flemming, still that he (defendant) would not be liable, for the reason that, when the accident occurred, Flemming was not within the scope of his employment, but on a mission of his own, and was acting contrary to-instructions.
The question here presented involves a further inquiry into the facts. It will be recalled that Flemming’s stand was at the-corner of Gravier and St. Charles streets;. *279 that he left that corner in order to take a passenger to the corner of Melpomene and Dryades streets, which point he left to go to his supper, intending at the time to return to his stand and resume work, which he actually did, notwithstanding the accident. He himself states, in effect, that as he was so near his home, at the time, and as it was his supper hour, he pursued that course in order to return to his work earlier. As there is very little additional evidence relating to this question, it may be best to quote it. It was elicited from defendant, and is as follows:
“Q. They (referring to the chauffeurs) had entire charge of those cars in the matter of contracting with people for rides in these cars, and he could go at any time he saw fit?
“A. Yes, but my rule was not (for him to) leave the stand while he was on business, not for him to take the car to 'go to supper, but once in a while he would tell me about it, and I would tell him I would rather see you take the street car.
“Q. But he had taken the car to go to supper once in a while?
“A. Yes.
“Q. What were his hours (Flemming’s) ?
“A. Prom 9 until about midnight.”
And on the second trial he testified:
“Q. You are the defendant in this suit. What were your instructions to the men who worked for you in your, livery business, and more particularly your instructions to the driver, Flemming?
“A. By all means to leave the car on the stand, and, if need be, to take the street car to go home.
“Q. And you stated that you also notified them to keep the car at the stand and only to use it for purposes of business?
“A.. Yes.”
From the above it will appear, considering the evidence quoted as a whole, that Flemming was to leave the car on the stand and not take it to go to supper. However, after taking the passenger to the corner of Melpomene and .Dryades streets, he found that it was his supper hour; that he was many blocks.from his. stand, and only four from his home; that by going four blocks out of his way he could resume his work considerably earlier. Did the instructions, under the circumstances, require him to return to the stand and park his car, in order to enjoy the privilege of going home to dine? We think not. The instructions were not applicable to such a situation. In departing slightly from his course, to dine, he still had in immediate view the reaching of his place of business. Such having been so,- we think, under the circumstances of the case, that he was still within the scope of his employment. He had some discretion as to how to act, at that time, in order to best serve his employer. For the negligence that arose, in carrying out what would seem to have been a proper solution of the question that had arisen, the master is liable. To say that Flemming was merely going to supper, and therefore was on a mission of his own, is to lose sight of the main purpose he had in view.
Defendant cites, in support of his position, Brenner et al. v. Ford, 116 La. 550, 40 South. S94. We,' however, do not think that the facts of that case make it applicable to the present. In that case, the servant, contrary to orders, and during his master’s absence, hitched the latter’s horse to a buggy, and drove him for his own pleasure, when the accident occurred. There, the servant was on a mission of his own, and therefore the master was not liable.
Defendant also cites Steffen v. McNaughton, 142 Wis. 49, 124 N. W. 1016, 26 L. R. A. (N. S.) 382, 19 Ann. Cas. 1227 ; but we think that the essential facts of that case make it inapplicable to the case at bar. There, the servant was employed to drive the automobile at the instance of his master, or any member of his family, and its use was prohibited him to go to his meals, to which he was expected to walk. Contrary to instructions, and therefore without authority, the servant *281 took the automobile, without his master’s knowledge, to go home to dine, when the accident occurred. As the servant, in that case, was wholly without authority to take the automobile from the garage for such a purpose, the master was not liable.
[4] In respect to the amount of damages that should be allowed, we have concluded that $5,000 is the proper amount. The child was bright, studious, and promising. It does not appear satisfactorily whether he suffered. The item for medical attention for Mrs. Duffy was ruled out by the lower court, and no complaint is made here because of the ruling. Damages for- the other items specified in the petition have been proved. The sum fixed above is intended as compensation for those damages, so far as that may be possible.
For the reasons assigned, it is ordered, adjudged; and decreed that the judgment appealed from be annulled, vacated, and set aside, and that plaintiffs, Thomas G. Duffy and his wife, Willie' Meigh Biggs, do have and recover judgment against the defendant, Walter L. Hickey, for said sum of $5,'000, with legal interest thereon from judicial demand till paid, and for all costs of this suit, in both courts.