No. 3586

Second Circuit

EMBRY ET AL. v. RESERVE NATURAL
GAS CO. OF LA.

Mabry & Carstarphen, and Albert P. Garland, of Shreveport, attorneys for plaintiffs, appellees.

Spearing & Mabry, of New Orleans, and A. M. Pyburn; Pugh, Grimmett & Boatner; J. N. Marcantel, of Shreveport, attorneys for defendant, appellant.

REYNOLDS, J. A motor truck, owned by defendant and operated by its servant, acting within the scope of his employment, knocked plaintiffs' son, Stanley Embry, aged three years and nine months, down, one of its wheels rolling over his body, killing him; and plaintiffs brought this suit to obtain judgment against defendant for $26,150, being $12,500 for each of them, as damages for the anguish caused them by the death of the child and loss of his love, society and companionship, and $150 funeral expenses incurred in his burial. They alleged that the death of the child was caused solely by the servant's negligent operation of the truck.

The defendant denied that the truck was negligently operated and denied that its servant was acting for it or within the scope of his employment at the time of the accident, and alleged that the accident was unavoidable, so far as its servant was concerned, and alleged that plaintiffs negligently permitted the child to play, unattended in a public street, and that their negligence barred recovery.

The case was tried to a jury on these issues and a verdict was returned in favor of each plaintiff for $3,750, and in favor of John S. Embry for an additional amount of $150. He remitted $13.75 of the $150, and judgment was rendered by the court against the defendant and in favor of John S. Embry for $3,886.25 and in favor of Mrs. Mary O. Embry for $3,750, with legal interest on each of the amounts from judicial demand, and defendant appealed.

OPINION

The accident happened about 9 o'clock in the forenoon on October 25, 1927, in the 2800 block of Maple street in the city of Shreveport. Maple street runs east and west and this block is bounded on the east by Missouri avenue and on the west by Arkansas avenue. The width of the street, between property lines, is sixty feet. There is a cement sidewalk on each side of the street, but the street itself is not paved, nor is there any curb on either side of it separating the sidewalk from the street. The block is four hundred feet long, and each side of the street is divided into ten lots of forty feet width each. Only one of the ten lots on the north side of the street is built on, namely, the fourth lot west of Missouri avenue. On the south side of the street two of the lots have houses on them, namely, the sixth and seventh lots west of Missouri avenue. The

house on the north side is known as No. 2822 and is occupied by Mr. Cassard. The houses on the south side are numbered 2821 and 2823, respectively; number 2821 being east of 2823. Number 2821 is occupied by Mrs. Roberts and No. 2823 by Mrs. Hodges.

The accident happened in front of Mr. Cassard's residence, Number 2822, on the east side of his house in front of his driveway.

The motor truck came into Maple street from Missouri avenue and stopped in front of Mr. Cassard's house near the west side of the lot and a negro woman, Leola Bryant, whom the driver of the truck, John Smith, without the knowledge or consent of defendant, had gratuitously carried there, alighted; and after a few seconds conversation with the woman, the driver put the truck in motion backward, his intention being to back it to and into Missouri avenue. When the truck had moved from where it was stopped, a few feet from the west side of the lot on which the house, Number 2822, stands, to a point in front of the driveway, a few feet from the east side of the lot, it struck plaintiffs' child, a wheel of the truck passing over and killing him.

The evidence as to exactly how the accident happened is conflicting.

Mrs. W. W. Roberts testified that she resided at Number 2821 Maple street and on the occasion in question had come out of her home and was on the sidewalk in front of her house. She saw the motor truck come into Maple street from Missouri avenue and drive up and stop close to a telephone pole in front of Number 2822 Maple street, Mr. Cassard's home. The telephone pole is approximately five feet from the west side of the lot on which Mr. Cassard's house stands.

"Q. How close to the pole was the truck located?

"A. Well, I couldn't say exactly, but it was about—bound to have been very close, because the child was about even with the driveway.

＊　＊　＊　＊　＊　＊　＊

"Q. Mrs. Roberts, will you state in your own way, what you saw next to this telephone post, and what happened?

"A. Well, when I started across the street I heard the noise of the truck which was parked there with the negro sitting there and there was a negro woman had gotten out and she was standing on the right hand side of the truck and he was turned talking to her and he was backing up all the time and just as I looked I saw the child behind the truck and the truck kept coming backward and struck the child about here and he fell backwards and fell right flat on his back and I screamed for the negro to stop and I ran toward the truck screaming for him to stop and he didn't stop and, of course, by that time just as soon as the child fell he turned over. The truck was high and the child turned over and got up on his little hands and knees and naturally he was excited and he tried to crawl out and he crawled between the left front wheel and the back and got about half way when the left front wheel ran over him and I screamed for the negro to stop, that he had killed the child, and that is the very first time he had ever heard me, and he stopped and jumped out, and picked him up and laid him in my arms.

"Q. Was the driver of the truck talking to someone?

"A. He was talking to the negro woman he had put out of the car.

"Q. Did you see the truck when it started backing?

"A. It was running when I heard it. It was making a noise when I first heard it.

"Q. Was the driver of the truck talking to the negro woman at the time he was backing up?

"A. Yes, sir.

"Q. Did the driver look back?

"A. He did not.

"Q. Did he sound his horn?

"A. He did not.

"Q. How far from the rear of the truck was the little fellow?

"A. Well, I couldn't just exactly tell. He wasn't very far, because when I looked I saw the child fall, and he wasn't standing—well, not very far, because the truck was moving and I saw the child fall backward.

"Q. Can you indicate the distance where the boy was standing?

"A. He was standing up in two or three feet, maybe not that far; but he was standing there naturally waiting for the truck to go on.

＊　＊　＊　＊　＊　＊　＊

"Q. Where you lived on West Maple street, in the vicinity where this accident occurred, all of the children play on your front yard and the other front yards and sidewalks?

"A. Yes, sir.

"Q. Play out in the street, too?

"A. Yes, sir; naturally, because nearly every yard was right out to the street."

Mrs. E. H. Hodges testified that she lived at Number 2823 Maple street and on the occasion in question saw defendant's truck come into Maple street from Missouri avenue and stop in front of Mr. Cassard's residence, Number 2822, near a telephone pole, and that there was a negro woman on the truck with the driver.

"Q. How long did he stay there?

"A. Well, I don't know just exactly how long he stayed there, but he stayed long enough for the negro woman to get out of the truck, and he was talking to her.

"Q. Did you see him when he moved this truck?

"A. When he moved backward?

"Q. Yes.

"A. I did.

"Q. What was he doing?

"A. Talking to the negro woman.

＊　＊　＊　＊　＊　＊　＊

"Q. Did you back the truck while he was talking?

"A. Yes, sir.

"Q. Did he sound his horn?

"A. No.

"Q. Did he look back?

"A. He did not.

"Q. Did he give any warning whatever that he was going to back that truck up?

"A. He did not.

"Q. Mrs. Hodges, were you noticing the child, where it was playing?

"A. Well, when I saw him first, he was on the opposite side of the street from the truck, and then the next time 1 looked up he was across the street standing 'kinder' behind the truck.

\* \* \* \* \* \* \*

"Q. I believe you stated that the truck was standing still when he crossed the street?

"A. Yes, the truck was still when he crossed the street.

"Q. Then, did he go to the rear or behind the truck?

"A. Yes; something—yes, he went behind it something like two or three feet from the back end of the truck and stopped.

"Q. When this truck was backed, as you have already stated, by the negro that was operating it, was the child standing still?

"A. When the truck started backing the child was standing still.

"Q. About how long had he been standing there, if you know?

"A. Well, I don't remember; I don't know.

"Q. Then, state what else you saw?

"A. Well, after the child stopped the negro began backing up and Mrs. Roberts, the lady living next door to me, screamed and hollered and told him to stop, and by the time she got that out of her mouth he had hit the child, I think with the two by four where the back of the body fastens on to the truck; that, or something back there, knocked him down and it kept backing and that put the child under the truck, because he was still backing, and then he got on his little all-fours and tried to come out, and that left front wheel passed over him.

\* \* \* \* \* \* \*

"Q. Was he coming toward the front end of the truck?

"A. You mean, was he crawling up?

"Q. Yes, or to the side?

"A. He was crawling out the side of the truck.

\* \* \* \* \* \* \*

"Q. That child had been playing on your side of the street when the truck first came up, hadn't it?

"A. Yes.

"Q. Did you see the child cross the street?

"A. Well, I saw it after it got about

"A. I suppose it was after the ball that middleways of the street, yes sir.

"Q. Going toward the truck?

"A. Yes, sir.

"Q. What was it going over there for? they had been playing with.

"Q. Did you see the ball?

"A. Yes, sir. They had been playing with it.

"Q. Well, where was the ball that the child was going after?

"A. Under the truck.

"Q. Did you see the ball under the truck?

"A. Yes, I saw the ball under the truck.

"Q. Was the truck moving or was it still when the ball went under the truck?

"A. It was still, but the child was waiting for the truck to start moving forward so he could get the ball.

\* \* \* \* \* \*

"Q. Well, after the ball rolled under the truck, and the boy started across the street to get it, just tell us, again, what happened, from that time on?

"A. When he got to the rear end of the truck, like two or three feet of it, the driver started backing up, talking to this woman on the street all the time, never looking back or sounding his horn or giving any signal whatever that he was going to move or back up, and about the time he began to back up Mrs. Roberts screamed at him and he didn't pay her any mind. He just kept talking to this negro woman all the time.

"Q. Why did the little fellow go to the back of the truck when the ball was under the middle of the truck?

"A. Well, I suppose he thought the truck would go forward."

An effort to discredit the testimony of Mrs. Roberts and Mrs. Hodges was made by the introduction in evidence of statements made by them soon after the accident and reduced to writing and signed by them.

That by Mrs. Roberts was as follows:

"Negro driving truck stopped in front of

No. 2822 West Maple street to let negro woman off truck. I was standing in front of my residence and saw the child across the street and saw the truck knock down the child and saw the wheel pass over its body. The child tried to crawl out from under the truck and about that time the left front wheel of the truck passed over the child's body. I did not see the child go under the truck, but he was under same when accident happened. The negro driver got out of truck and picked the child up and I ran across the street and took the child from the negro's arms and carried it toward home where I met the mother coming up the street."

Mrs. Hodges' statement was as follows:

"I was standing in my door at No. 2823 West Maple street and saw a truck pull up and stop at No. 2822 West Maple street. I noticed a negro woman get out of truck, and the driver of truck started to backing up to Missouri avenue, where he intended to turn around. The little child had been playing with a ball and it seems that ball went under the truck that was standing there. The driver started backing up just as the child started under the truck after the ball, and the left front wheel of the truck ran over the child and killed it. The driver stopped after the accident and picked up the child and held it in his arms until Mrs. Roberts came and took the child from him. Little John Stanley Embry was playing ball with other children when the accident happened."

These statements of Mrs. Roberts and Mrs. Hodges may be in conflict with their testimony as to where the child was when the truck began to back, but they are not in conflict with their testimony that the driver did not look back or blow his horn or give any other notice that the truck was going to move before it began to back.

John Smith, the driver of the truck, testified that, on the morning of the accident, he got the truck out of its storage garage and supplied it with water and gasoline. The garage was on the outskirts of the city. He received instructions by telephone from defendant to go with the truck to the warehouse of the Lee Hardware Company, which is in the center or business part of the city, and there get a load of dynamite and carry it to Cotton Valley. That after giving the truck water and oil and gas he drove toward his home to get his breakfast and on his way to his home saw a woman that he knew, Leola Bryant, who asked him to take her to her work on West Maple street. That she got on the truck and he drove with her to her place of work.

"Q. What happened after you got there?
"A. Well, when I drove up in the truck, she got out of the truck and said 'much obliged,' and I said 'don't mention it,' and I looked behind me and didn't see nothing and I was looking behind me backing up and didn't see nothing behind me whatever and in backing the truck up I ran over this child. Some lady screamed and that caused me to look around, and when I looked I seen the child lying in front of me and I stopped the truck and asked what was the matter and some lady told me 'you have killed that child,' and I got out and picked the child up and some lady met me and I said 'let's take him to the sanitarium' and she said 'I will carry him, give him to me' and I give him to her and continued to back up to Missouri avenue and turned around.

"Q. How long did you stop your truck before you started back?
"A. Just long enough for the woman to get out.

"Q. Where did you intend to go, when you started again?
"A. I was going on to Missouri avenue and continue my trip home.

"Q. For breakfast?
"A. Yes, sir.

"Q. How far had you moved backwards when you heard this lady scream?
"A. When I heard the lady scream, according to my estimate, I should have moved about fifteen feet, when I heard her scream.

"Q. Then you looked around toward the front of the truck?

"A. Yes, sir.

"Q. What did you see?

"A. I seen the child laying in front of me.

"Q. Where was it, on the road?

"A. Yes, sir.

"Q. In front of your truck?

"A. Yes, sir.

"Q. How far in front of your truck?

"A. About fourteen feet, according to my estimate.

\* \* \* \* \* \*

"Q. Were there any children on the street when you drove up there?

"A. No, sir.

"Q. Were there any out in the street?

"A. No, sir; there wasn't any out in the street.

"Q. How long after you heard this lady scream was it before you stopped your truck?

"A. Just the minute I heard her scream I looked around and stopped at once.

"Q. How fast were you going?

"A. I couldn't tell you, but I wasn't going very fast. I was going very, very slow.

"Q. Had you just started backing the truck?

"A. Well, I had been backing it long enough to back up about fifteen feet.

\* \* \* \* \* \*

"Q. Did you know what the rules of the Reserve Natural Gas Company were about truck drivers taking on people to ride?

"A. I do and did.

\* \* \* \* \* \*

"Q. What were those rules?

"A. Not to haul any passengers.

"Q. You knew that, didn't you?

"A. I did.

"Q. Well, when you picked up this colored woman, you were violating the rules of the company?

"A. I was."

On cross-examination he said:

"Q. Then, when you turned into West Maple, did you see any children on the other side of the street?

"A. There were some children on the south side.

"Q. How many?

"A. I don't know.

"Q. Where were they?

"A. Over in the yard.

"Q. Which is opposite to where you were?

"A. Yes, sir.

\* \* \* \* \* \*

"Q. And you stated that you backed the truck about fifteen feet, is that right?

"A. That is right.

"Q. Then when you backed the truck fifteen feet, during that time, when and how did you strike the boy?

"A. I don't know. I don't know how it was, but there he was, because I didn't see him until the lady screamed and called my attention, and I looked around, and when I looked around the child was lying as much as fifteen feet or more ahead of me."

We are of the opinion that at the time of the accident the driver of the truck was acting in the scope of his employment. His day's work had already begun by his supplying the motor of the truck with water and oil and gas and taking the truck out of its storage garage and receiving instructions from his employer what the day's work was to be. The fact that before going to the Lee Hardware Company's warehouse to get the load of dynamite that he was instructed to go there and get and carry to Cotton Valley he decided to go to his home and get his breakfast and was on his way there to do so and concluded to deviate therefrom to the extent of taking the negro woman, Leola Bryant, from where he found her to her place of work, before going to his home, does not, we think, alter the fact that he was in the scope of his duty to his employer. (Duffey vs. Hickey, 151 La. 274, 91 So. 733; Glass vs. Wise & McAlpin, 155 La. 477, 99 So. 409.)

In the former case, it was said that where a chauffeur employed to drive an automobile for hire was directed to leave the car on the stand when he went to supper, but after carrying a passenger to his destination, was many blocks from his

stand and only a few blocks from his home and could resume his work considerably earlier by going a few blocks out of his way for his supper, the chauffeur was still within the scope of his employment in doing so.

Neither do we think plaintiffs were negligent in permitting the child to play, unattended, in a public street.

It was said in Westerfield vs. Levis, 43 La. Ann. 63, 9 South. 52, that parents are not obliged to restrain their children within doors at their peril, and that the fact that a child five years old had strayed more than two blocks from home, at play with other children, is not of itself evidence of contributory negligence on the part of the parents.

And in Palermo vs. Orleans Ice Mfg. Co., 130 La. 833, 58 South. 589, 40 L.R.A. (N.S.) 671, it was said that a parent is not negligent in permitting his child, four years of age, to be on the sidewalk adjoining his residence.

In the case at bar the plaintiffs lived in the 2900 block of West Maple street and the accident occurred in the 2800 block, which adjoins the 2900 block on the east.

It was negligence for the driver of the truck to back it in a residential street, where he had almost at the same moment seen small children at play on the sidewalk nearby, without first assuring himself that no one was in the path of the backing truck.

It was said in Pease vs. Gardner, 113 Me. 264, 93 Atlantic 550, that:

"A chauffeur who, on a town street, started to back his automobile without looking to see if anyone was behind him, and ran into a horse and wagon, was negligent, though he did not know of their presence."

An ordinance of the City of Shreveport, regulating street traffic. introduced in evidence, provides:

"That vehicles may turn only at street intersections. This turn shall be made beyond the center of the street intersection, and in the direction in which traffic is headed."

Both Mrs. Roberts and Mrs. Hodges testified that the driver of the truck did not look back of his truck before starting it to see if any person was in its path and did not blow the horn or give any other signal of his intention to put the truck in motion. The driver testified otherwise, but the trial court accepted the testimony of Mrs. Roberts and Mrs. Hodges as correct and so do we.

Defendant insists that the allowance of $7,500 for the death of the child, $3,750 to each parent, was excessive, and that if the judgment be sustained the amount of the award should be reduced to $3,000 for both parents, that is $1,500 to each of them.

We do not consider the amount of the award unreasonable. The child was in good health, and bright and lovable. He was only three years and nine months old and therefore had practically his entire life expectancy before him.

In Selser vs. Revol, 152 La. 447, 93 So. 675, $6,000 was allowed for the death of a child nine years old, and in Rousseau vs. Texas & Pacific Ry. Co., 4 La. App. 691. $6,000 was allowed a father and mother for the death of their son.

After carefully reading the record we have reached the conclusion that the judgment appealed from is correct and accordingly is is affirmed.