## LETEFF v. PEOPLE'S ICE & FUEL CO., Inc., et al.

### No. 1154.

Court of Appeal of Louisiana. First Circuit.
June 30, 1933.

Taylor, Porter & Brooks, of Baton Rouge, for appellants.

Ben R. Miller and J. Y. Sanders, Jr., both of Baton Rouge, for appellee.

LE BLANC, Judge.

This is a suit for damages for personal injuries arising out of a collision between a motorcycle and an automobile, which occurred at the corner where Iberville street joins Government street in the city of Baton Rouge, about midday on February 1, 1932.

Irvin Leteff, nineteen year old son of Joseph Frank Leteff, who prosecutes the suit in his behalf and for his use and benefit, was temporarily employed as delivery boy at Pace's Drug Store, located on Government street. He used a motorcycle to make his deliveries. On the day of the accident, he was traveling east, on his motorcycle, on Government street, and, as he reached the corner at Iberville street, he ran into a Ford coupé being driven by G. Romano who was attempting to make a left-hand turn from Iberville into Government street.

Alleging that the Ford coupé was suddenly brought to a stop after having started to cut the corner, and blocked his pathway, Leteff's father charges in his petition that the injuries suffered by his son were caused by the gross negligence and carelessness of Romano, who, at the time, was acting in the scope of his employment by the People's Ice & Fuel Company, Inc., owner of the automobile, and that both he and his employer are responsible for the damages sustained. Alleging further that the New Amsterdam Casualty Company of Baltimore, Md., had insured the automobile involved in the accident under a property damage and public liability policy of insurance, plaintiff made that company party defendant also and prayed for judgment against it in solido with the other defendants. He avers that his son suffered a broken leg, an injury to his right hip, and severe injuries and bruises to the head as well as deep gashes in his right leg. He avers that on account of his son's said injuries he has incurred hospital and medical expenses amounting to the sum of $309.15. For these and for the alleged permanent disability of his son arising from a broken leg, which he assesses at $7,500, and for the pain and suffering and mental anguish which his son endured, valued at $2,000, he asks for judgment in the full sum of $9,809.15.

There were various exceptions filed by the defendants, all of them being overruled in the lower court. We find no mention or reference made to them in this court and they have not been considered.

The defendants for answer to the petition, deny the negligence charged against the driver of the Ford coupé, claiming that he had pre-empted the intersection and therefore had the right to proceed on his course. As an alternative, they pleaded that even though he be held negligent, that young Leteff was also negligent in operating his motorcycle at forty-five miles an hour, in violation of the city speed ordinance, and, therefore, his contributory negligence bars his recovery.

The district judge rendered judgment in favor of plaintiff and against all three defendants, in solido, in the sum of $3,309.15, and they have all appealed. Plaintiff has answered the appeal asking for an increase to the amount originally demanded.

We find but little difficulty in concluding from the testimony that Romano, the driver of the Ford coupé, was guilty of negligence. Government street in Baton Rouge is shown to be a right of way street. Young Leteff therefore was on the favored street. Romano was not only on the less favored

street, but he was engaged, at the time of the accident, in performing what is generally considered a dangerous feat in driving at one of our busy city street corners. That is, he was in the act of making a left hand turn from the less favored street into the more favored one on which traffic was running both ways. In this connection it may be pertinent to remark here, too, that the less favored street on which he was does not run across Government street but comes to a stop where it enters it, and it was necessary, in order for him to proceed, to turn either to the right or left.

Romano and his brother, who was his guest in the coupé, both say that on reaching the corner he came to a complete stop; that they both looked east and west for traffic, and as they saw none he proceeded to make the turn. As he went on, Romano, the driver, says that he looked to the west again, saw young Leteff coming at a rapid rate of speed and he stopped again. He had not quite reached the street car tracks in the middle of Government street when he stopped, and it is shown that the distance from the south rail of the track to the south curb of Government street is fifteen feet. There were automobiles parked along the south curbing of Government street and there was one coming from the east on the north side of Government, so it is easy to visualize how Romano blocked the pathway on the south side of the street, on which Leteff was traveling, and how he was bound to have run into the Ford coupé if he kept on going. It appears to us that if both these parties looked to the west, as they say they did after stopping at the corner, and there was nothing to obstruct their view, one says for a whole block and the other says for two blocks, then they were bound to have seen young Leteff coming toward them in Government street. That is where he was at that very moment and they could not help but see him. If they saw him, it was Romano's duty to remain stopped at that corner as he says he was when looking, before attempting to make that turn. If they looked and did not see Leteff, it is the same as if they had not looked at all and the law holds the driver of the automobile to the same responsibility. It is our conviction that either one of two things happened. Romano was "cutting the corner" as the expression is frequently used and he did not look, or, if he looked, he thought that he had time to cut ahead of him, realized too late that he could not, came to a dead stop, and blocked the street in such way that Leteff had to run into him as he says he had to on account of the condition existing at the moment and which we have already described. In either event, he was grossly negligent and should be held liable for the accident unless it has been shown that Leteff, by his own negligence contributed thereto.

The theory on which this young man is sought to be held guilty of contributory negligence is that he was in view of the driver of the automobile which had already pre-empted the intersection and instead of having his motorcycle under control, continued driving at an excessive rate of speed alleged to have been forty-five miles an hour.

As we have already endeavored to point out, this is not the usual intersectional automobile accident. It is one in which a driver is shown to be attempting to make a left-hand turn into a right of way street on which traffic was running both ways, and if, as Romano says, he stopped when he came to the corner, Leteff had the right to expect that he would remain in that position of safety until he had passed. Romano was negligent not only in not remaining in that position, but in starting on and coming again to another complete stop. If he had pre-empted the intersection as is claimed for him, his real negligence consisted in not maintaining this advantage but in coming to a second abrupt stop in the middle of the driveway. Therefore, the only way in which Leteff could, in our opinion, have been negligent was if he was speeding as the defendants contend he was.

On the question of his speed, we believe that the testimony again favors young Leteff. He says that he had slowed down in the block immediately west of Iberville street, to permit a truck that was crossing Government street to pass in front of him. The driver of that truck, a negro by the name of Davis, corroborates him on this point. Davis' testimony is questioned on the ground that it is not shown that the day on which he says this happened is known by him to have been the same day on which the accident occurred, but all the facts and circumstances tend to prove that it was the very same day. Besides, two other witnesses, one a young lady by the name of Muriel Martin and the other a young man named Shevelin, both saw Leteff in the same block between South 13th and Iberville streets, and both testify that his speed was about twenty or twenty-five miles an hour. The testimony of Miss Martin is to the effect that she was on Government street, going south, about the middle of the block between South 13th and Iberville when Leteff slowed down and allowed her to cross Government street ahead of him. She is well acquainted with Leteff and says that they greeted each other as they met in the street. If Leteff had already slowed down to permit the truck to pass and again reduced his speed to allow Miss Martin who was on foot to pass in front of him, it is difficult to conceive how he could have been going at an excessive speed. These facts give weight to his estimate of his speed which he places at from fifteen to twenty miles per hour. The two Romanos say that he was going fast, the de-

fendant estimating his speed at forty-five to fifty miles an hour. Another witness named Hansen says that he would judge it was about forty-five miles. This last witness was not in a very favorable position to judge the speed of the motorcyele and as a matter of fact bases the estimate he makes, not on having seen the motorcycle going at that rate as he saw it when it was only three feet from the Ford coupé, but on the noise created by the impact and the fact that Leteff, after falling off his motorcycle, rolled several feet eastward in Government street. It becomes apparent, upon reading this witness' testimony, that his estimate of forty-five miles is purely a surmise on his part with nothing whatever to support it. The testimony of both Romanos on this point is not worthy of more consideration. In the first place, from their position in the Ford coupé, looking at the motorcycle coming toward them, it was almost impossible for them to judge with any degree of accuracy the speed at which it was coming. In the second place, they both say that they did not see the motorcycle at all when they stopped the first time and G. Romano, the driver, only saw it when he looked down the street the second time when it was almost upon him. His brother says that he did not see it until just about the time it hit the coupé. We cannot therefore place much confidence in their estimate as to the rate of speed at which Leteff was traveling.

We find that the preponderance of the evidence shows that the motorcycle was going at about twenty miles an hour when the collision occurred, which, under the circumstances presented, we do not think was excessive. His speed cannot, in our opinion, be said to have contributed to the accident for which we find Romano alone to blame, and for which he was held responsible and his codefendants liable with him by the district judge.

We have no doubt but that young Leteff was seriously injured as a result of this accident, but we are not persuaded from the testimony of the doctors that he is permanently disabled from having had a leg broken. His claim for permanent disability, it will be recalled, constitutes his largest item of damage. There is a stipulation at the end of the transcript of testimony to the effect that at the time of the trial of his case he was again working for the same drug store, at reduced wages, and that he rode a bicycle instead of a motorcycle. At the most therefore, there would be, if any, only partial disability, with probabilities, as we read the evidence of an entire recovery in the course of a few months. There is a possibility in this connection, however, of his having to submit to some major operation. The trial judge evidently took this into consideration together with the pain and suffering which this young man endured in fixing the amount of damages allowed by him. We believe the award is entirely fair to all parties concerned and we will not disturb it in any way.

For the foregoing reasons, the judgment appealed from is affirmed, appellants to pay all costs.

ELLIOTT, Judge (dissenting).

The difference between the majority of the court and myself is not as to the negligence of G. Romano in entering Government street but concerns the speed at which Irvin Leteff was driving as he came forward on Government street and as to when he first saw defendant's automobile and also as to whether he took proper care and precaution for his safety, after acknowledging to have seen it in the street ahead of him and commencing to turn.

Government street in the city of Baton Rouge runs east and west. Iberville runs north and south and terminates at Government street. Government street is thirty-five feet wide. A street car track about five feet wide occupies the middle of it, leaving fifteen feet of width on each side. A party driving north on Iberville, upon reaching Government, must, if he proceeds further, turn east or west on Government street.

No ordinance on the subject of speed was offered in evidence and there is none indicating that the street is a part of the state highway system. It was agreed on the trial that a city ordinance provides that: "All vehicles turning to the left in another street shall pass to the right of and beyond the center of the street intersection before turning." Under the ordinance it is permissible for vehicles entering Government from Iberville to turn to the right or left in Government street, as the driver may desire, but he must first pass to the right of and beyond the center of the intersection.

Government street is straight. The collision occurred about the middle of the day, and, as there is nothing said about visibility, it may be assumed to have been fair.

G. Romano accompanied by his brother, A. Romano, driving an automobile referred to as a Ford coupé, going north in Iberville, testifies that upon reaching its intersection with Government street he stopped his automobile and from his seat as driver looked east and west along Government street. That, seeing nobody coming, he started up and entered Government street, his purpose being to turn to the left. I agree with the majority of the court that he either did not stop at Government street and look for traffic as he should have done, or he did not stop and look from a place where he could see vehicles coming in the street or he did not look up and down the street carefully.

The evidence shows that the motorcycle on

which Irvin Leteff was riding in Government street was so close at hand that he was bound to have seen its approach had he looked carefully from a proper position before entering the street. The evidence shows that the south side of Government street is intersected by various streets. These intersecting streets are warnings to the drivers of motor vehicles on Government to be on guard against vehicles coming into it from these intersecting streets. The distance between these intersections is not clear. The street situated next to Iberville going west is called 13th or Fannie street. There are statements of witnesses which indicate that the distance between 13th or Fannie street and Iberville is about one hundred twenty feet, but the map in the record indicates a greater distance. The evidence indicates frequent traffic on Government street.

Both the Romanos, speaking of Leteff's speed, when they saw his approach, claim that it was very fast, estimating that it must have been about forty-five miles an hour.

C. P. Hansen testifies that standing in his place of business at the corner of Iberville and Government streets he saw the Romano automobile stop as it reached Government street, and that Romano looked east and west. "Then he drove off. His car drove off until his right front wheel touched the South track of the street-car track. There he stopped dead" with his car facing northwest. That he did not see the motorcycle until it was practically on the car, within about three feet of it. He gave it as his opinion that the motorcycle was running at about forty-five miles an hour at the moment he saw it, basing his opinion "on the crash and the distance the boy rode" by which I understand him to mean the noise made as a result of the impact and the height in the air to which the boy was thereby thrown and the distance which his body rolled after striking the ground.

Defendant's automobile was stationary at the time it was struck and he says that when the motorcycle struck the automobile the Leteff boy went about three feet in the air, hit the ground, and rolled about thirty-five feet.

Luke Marchand says he heard the crash and saw the boy five or six feet in the air. A Ford coupé is one of the lightest makes of automobiles and likely yielded some. The severity of the boy's injuries and the height and distance to which he was projected as a result of the impact is to my mind satisfactory proof that the motorcycle was running at great speed at the moment of the impact and a safer guide in that respect than his own estimate and that of the witnesses on that subject.

Another ground of difference is as to when Irvin Leteff first saw defendant's automobile and also as to his prudence and care after he acknowledges to have seen it in his front.

The petition of the plaintiff alleges that Irvin Leteff was approximately thirty feet from the intersection of Iberville street, when he first saw the Romano automobile approaching Government street and commence a left-hand turn; that there was ample time for it to have made its turn; and that he believed and had every reason to believe that the driver of the automobile would continue his turn, clear the intersecting point, and allow him to continue his passage along this right of way street. That, however, the driver of said automobile negligently, carelessly, and in disregard of the rights of said Irvin Leteff did bring his automobile to a complete stop, with the right front wheel thereof resting upon the south track of the street car line along Government street, with said car facing approximately northwest and completely blocking the passageway along the south side of Government street. That at the time the automobile stopped, Irvin Leteff was within approximately fifteen feet of said car and going at a moderate, careful speed, not in excess of twenty miles an hour.

The negligence of the defendant is thus alleged to have consisted not in a sudden and unexpected entrance into Government street but in stopping and not continuing to go forward after entering. It is the theory of the averment that if the Romano car had kept going after it had entered and crossed to the street car track, it would have cleared the intersection before Irvin Leteff reached the place, and that no collision would have occurred.

Plaintiff's cause of action is not based on an alleged negligent entry and turning but on an alleged negligent stopping, when he should have kept going. The averment implies that Irvin Leteff saw defendant's automobile crossing Government street in his front at such a distance ahead, that he formed the conclusion that if the automobile kept going, it would complete its turn by the time he reached it, leaving the street open for him to pass; that, acting on the assumption that it would keep going, the Leteff boy took no precaution but went forward until it was too late to stop.

Irvin Leteff testifies that when he first saw defendant's automobile it was moving forward crossing Government street and turning to the left, that is, toward him. He does not as a witness, in giving his testimony, claim to have seen it stopped at the threshold of Government street before it had entered, and that expecting it to remain there, he undertook to pass it, when it unexpectedly started up barring his way.

The opinion, however, says: "And if, as Romano says, he stopped when he came to the corner, Leteff had the right to expect that he would remain in that position of safety un-

til he had passed, Romano was negligent not only in not remaining in that position but in starting on and coming again to another complete stop. If he had pre-empted the intersection as is claimed for him, his real negligence consisted in not maintaining this advantage but in coming to a second abrupt stop in the middle of the driveway. Therefore the only way in which Leteff could in our opinion have been negligent, was if he was speeding as the defendant contends he was."

Irvin Leteff's testimony does not bear out this position.

"Q. At the time you first saw this Ford coupé driven by Mr. Romano, where were you? A. I must have been about 20 feet from him whenever I first saw him.

"Q. At that time where was the Ford coupé? A. It was coming out of Iberville Street going into Government about half way between the South street-car track and the South curb on Government Street.

"Q. About that time he was about half way in the intersection. A. About half way.

"Q. What did you believe the driver of that car intended doing? (Objection made and overruled.) A. I thought he was going to make a turn and to come Westward on Government Street; that he was going to complete his turn on Government coming Westward.

"Q. As a matter of fact what did he do? A. He came to a complete stop, with his left front wheel on the South rail of the South track and the back end of his car was near the Iberville curbing Southwest of the Iberville curbing.

"Q. Where was his right front wheel? A. His right front wheel was in between the two street-car tracks running along Government.

"Q. At the time that he brought his car to a complete stop in that position, where was your motor-cycle? A. I must have been about 10 feet from him.

"Q. What did you do then? A. I made a short dive to go in front of him but another car was coming Westward on Government Street and I could not complete going between there because the other car would have hit me face to face."

### Cross-examination.

"Q. How fast was Romano's car traveling as it went into Government Street from Iberville Street? A. I don't know. I could not say how fast it was going.

"Q. It was just creeping along? A. He came out like he was going to make a curve.

"Q. About 5 miles an hour? A. I could not say exactly how fast, I don't know.

"Q. Did you see it? A. I seen it whenever it got half way between the South street-car track and the curb.

"Q. That was the first time you saw it? A. That was the first time I saw it.

"Q. And you were then how many feet away from it? A. I was about 20 feet from it then.

"Q. It stopped very suddenly as you approached it? A. Whenever he came out further in Government Street he stopped."

As thus shown by the testimony of Irvin Leteff, he does not claim to have seen defendant's automobile, stopped at the threshold of Government street, and, seeing it there, was thereby encouraged to continue his way, when it started up and barred his way. His claim, as a witness, is that when he first saw it, it was moving across Government street, making its turn, and he reckoned on its completing its turn and clearing the intersection before he reached the place. Romano says that when he first saw Leteff he was so close at hand and coming so fast that he saw he could not make his turn, so he stopped. Whether Romano acted wisely or not in stopping depended on Leteff's speed and proximity.

I take the position that when Irvin Leteff saw defendant's automobile come out of the Iberville intersection into Government street ahead of him he should have promptly and without taking any chances placed his motorcycle under such control that he could make an emergency stop, as the exigencies of the case might require. He took no precautions and kept up his speed until he was so close to the automobile that when it stopped he could not. His collision with it was therefore the result of taking no precautions in the face of an obvious hazard.

There is only inferential testimony concerning the rate at which defendant's automobile crossed Government street. It was likely moving very slow because it had just started up and was making a turn. A motorcycle coming in the street is not as conspicuous as an automobile. G. Romano testifies that when he first saw the motorcycle, it was about a block or one hundred twenty feet distant. A. Romano says that when he saw it coming, it was about two blocks away.

My conclusion is that Irvin Leteff took no timely precautions after seeing an obvious hazard in his front but drove forward recklessly and heedlessly until it was too late to stop, thereby bringing on a collision, when prudent driving on his part would have avoided it.

The principle, which I think should govern, in this case is practically the same that existed in Tyer v. Gulf, C. & S. F. R. Co., 143 La. 177, 78 So. 438, 439, in which the court says: "This case is very similar to that of Mrs. Sadie Rogers v. La. Ry. & Navigation Co. [143 La. 58], 78 So. 237, lately decided by us; and we hold here, as we did in that case, that, plaintiff having failed to clearly

show that the accident might have been avoided by the exercise of ordinary care on the part of the locomotive engineer, after the danger of the situation was, or should have been by him, discovered, she is not entitled to recover."

The Tyer Case was followed in principle by this court in Norwood v. Bahm, 14 La. App. 261, 129 So. 183. The case Duffy v. Hickey, 151 La. 274, 91 So. 733, cited in the Norwood Case, is also applicable in principle.

Plaintiff's right to recover is to my mind defeated by the contributory fault and negligence of Irvin Leteff in not taking timely and prudent precautions against a collision after he had seen or should have seen defendants' automobile enter into Government street and commence turning in the street in front of him. I think the judgment appealed from should be reversed and plaintiff's demand rejected.