No. 602

First Circuit

## NORWOOD v. BAHM

(April 14, 1930.   Opinion and Decree.)
(June 9, 1930.   Rehearing Refused.)
(August 7, 1930.   Writs of Certiorari and
Review Refused by Supreme Court.)

A. W. Spiller, of Hammond, attorney for plaintiff, appellee.

P. M. Milner, of New Orleans, and Ellis, Ellis & Ellis, of Amite, attorneys for defendant, appellant.

MOUTON, J.   On the morning of February 14, 1928, plaintiff, Miss Lucille Norwood, was struck at the intersection of Thomas and Orange streets, in the town of Hammond, by a truck which Charles Kemp, an employee of defendant, was driving at the time.

Judgment was rendered in her favor for $5,850 in damages, including medical expenses.

Defendant appeals.

Thomas street runs east and west through Hammond, Orange street, north and south, but is a blind street as it crosses Thomas street, stopping on the north line of that street.   The East Side High School building, of Hammond, is situated south of Thomas street, near the intersection of the two streets.   There is a pedestrian or foot crossing which runs from the northern

side of Thomas street across that street into Orange street.

Plaintiff was, at the time of the collision, a teacher in the East Side High School. She was going there at about 8:30 a. m. to begin her day's work at that institution, when she was injured. It was while she was walking on this crossing from the north side of Thomas street on her way across that street that she was struck by the truck Charles Kemp was driving. The collision occurred about the center of Thomas street, or perhaps a little further to the north thereof. The truck was going east, at the time, while plaintiff was coming from the opposite direction on the north side of Thomas street before she turned around to cross that street on the footway which led towards the high school.

The trial judge found that when she approached the crossing which she was accustomed to use daily, that she started across Thomas street without looking west or in the direction of the approaching car, and did not see or hear it. It seems that her head was inclined downward while she was going over the crossing, and there is therefore no error in the conclusion of fact arrived at by the court, as above stated. Her hearing in the right ear, the direction in which the truck was advancing on her, was only slightly deficient. This is shown by the evidence of Mr. L. A. Simms, superintendent of the schools in Hammond, who testified that she had taught many years, and that he had never heard that her hearing was in the least affected until after the accident, which unquestionably caused the deafness with which she was afflicted when the case was tried. Although the judge said that plaintiff was unconsciously walking on the crossing, and had not seen the truck which was bearing down upon her, the court found that the driver was however respon-

sible for the collision, as he then had a clear vision ahead of him, could and should have seen the dangerous position where plaintiff had placed herself, and in time to have averted the accident. The district judge therefore applied the doctrine of the last clear chance, and held defendant liable.

It is shown that over 500 children were in daily attendance at that school where this accident occurred, and that about one-third of that number, and also the general public, used the crossing in question every day. The fact is that this crossing was used to such an extent that the boy scouts had undertaken to regulate the traffic there, and that a policeman had been asked to be placed at that crossing. It is also shown that Thomas street, over which this crossing runs, is the main thoroughfare of the town of Hammond, which makes it apparent that, at the opening hour for that school, at which time this accident happened, a dangerous situation existed there, imposing unusual care and caution on drivers of cars, autos, or trucks at the intersection of Thomas and Orange streets.

Charles Kemp, the driver of the truck, passed that spot in his delivery wagon, which he operated for defendant, many times every day, had besides been a pupil at that school, and was perfectly familiar with the conditions which existed there at the opening hour of the school, and knew that a large number of these children congregated in its vicinity and, with others, used the footway across Thomas street where his truck collided with Miss Norwood, plaintiff in this case, and one of his former teachers at that institution.

In Mequet v. Algiers Mfg. Co., 147 La. 364, 84 So. 904, the court, in the syllabus says:

"The driver of an automotive vehicle on a public street must, at points provided for

the passage of pedestrians, exercise a high degree of care to avoid accidents, etc."

Further on in the opinion, the court, in addition to the foregoing statement, expressed itself in the following language:

"But at the points provided for the passage of pedestrians they have the right to assume that the operators of such machines will observe that high degree of care imposed by the circumstances."

And again in concluding the opinion, the court, in referring to pedestrians, said:

"We do not mean * * * that he is to be excused for failing to use his own senses to being injured; but that the greater duty and care rests upon those who use these dangerous agencies carrying such great possibilities of harm."

In the opinion of the court from which the above is taken, the unusual care required of the driver of an automobile when he approaches a street crossing where people are constantly crossing is set out in clear and unmistakable language.

In a later case, Duffy v. Hickey, 151 La. 274, 91 So. 733, in reviewing the very case from which we have extracted the quotations hereinabove given, the court in defining, with more precision, the duties of the driver under similar circumstances, held the following to be the rule:

"It was an automobile driver's duty, when he approached a street crossing where people were constantly crossing, to have the automobile under full control, so that it could be stopped quickly in event of emergency and to have his lights burning."

The reference to the lights burning has, we must say, no application here, as the accident occurred in broad daylight, but the rule embodied in the foregoing expression of the court, in our opinion, applies with equal force when the elements of danger, to which we referred, are present when the collision occurs, whether the time at which it happens be day or night.

The two cases cited by us are not referred to as precisely or exactly presenting the same facts which appear in the instant case, but which we have invoked because they recognize the rule which should invariably govern car or auto drivers when they are confronted with conditions demanding the commensurate care required to avoid collisions which may, at any time, arise from emergencies at pedestrian crossings where people are "constantly crossing."

In order to bring the vital issue in this case under the operation of the rule above reproduced, our first inquiry must be in reference to the speed at which Charles Kemp was driving the truck when it struck plaintiff.

Frank Sawyer, the driver, at the time of the occurrence, of a school truck for the school board, saw the accident. Thomas street, on which the truck was traveling, has an asphalt pavement 18 feet wide, with gravel shoulders of about 3 or 4 feet on each side, not including the gutters to which the street extends. He heard the squeaking on the pavement of the wheels of the truck as it slipped or skidded after the brakes had been applied by Kemp before the collision occurred. Immediately after the accident he noticed a depression in the asphalt, which as he expressed it, showed where the brakes "started" to "hold" or "grip" the pavement. The imprint of the wheels of the truck were measured by him. He says he stepped along the line of the marks on the asphalt which showed the skidding of the wheels of the truck, and that these marks started at about 20 or 22 feet on the west side of the foot crossing Miss Norwood was using, this crossing being on the east side of Orange street. The truck, he testified, stopped 22 or 25 feet east of the place or spot where plaintiff was struck. He tes-

tified that his steps covered about 3 feet to the step. The marks between the points from where they began and ended measured approximately a distance of 44 feet, which Sawyer says he had covered in his 14 big steps along the asphalt pavement. These wheel marks of the truck on the pavement were also stepped off soon after the accident by L. A. Simms, school superintendent, who found that they extended 15 steps to the end of the track, where some blood was seen which evidently came from the fall Miss Norwood suffered when she rolled off the front of the truck by which, the evidence shows, she had been carried about 20 feet from the foot crossing where she was hit. Mr. Simms estimated the length of the wheel marks at about 45 feet, thus agreeing with Mr. Sawyer to the measurement actually made by both of these witnesses.

Mr. Simms was taken to the scene of the accident shortly after it occurred by Mr. Bahm, defendant in this case. Simms says Bahm saw where the truck had skidded, and though he could not recall the exact words Bahm had used, testified he had said, referring to Kemp, "He certainly was driving pretty fast from the distance the car skidded."

Sawyer testifies that Bahm, in referring to the car tracks, said it was no use for Kemp to say he wasn't speeding, for there were these wheel marks showing that he was speeding.

In his evidence in answer to a question from his counsel, Mr. Bahm said: "I probably did state that probably the boy was driving too fast," but explains he did not feel technically responsible at the time, but that what he said was the outcome of a charitable feeling towards Miss Norwood.

Simms and Sawyer have no interest whatsoever in the outcome of this suit, and it is not to be believed that they would have falsely ascribed such a statement to defendant, who, on the other hand, has a lively interest in defeating the demand claimed against him in these proceedings. Though he denies that he made the statement referred to, his explanation is in the nature of an excuse, and is quite unconvincing and unsatisfactory.

Charles Kemp testified that he was going at a speed not exceeding 15 miles an hour. He says when he first saw Miss Norwood she was about 3 feet on the asphalt. He says also, that she was about 3 feet in front of the truck when he put his brakes on. He again repeats that she was about 3 feet on the asphalt when he first saw her and which, no doubt must have been the case, as he says he did not have the time to blow his horn. Then again he testifies that when he first applied the brakes the truck was about a foot or a couple of feet "from where that walk is across the street." It was on this "walk" that Miss Norwood was struck, and the testimony given by Kemp definitely fixes, according to him, the place where he applied his brakes. It is clearly shown that the skidding started not less than 20 feet on the west side from the foot crossing referred to by Kemp. Two witnesses have clearly established that fact, and which must be accepted as true as it is nowhere contradicted. It was shown, and not denied, that a car traveling at 15 miles an hour can be stopped within a distance of 15 or 18 feet. As it unquestionably appears that the brakes, which were admittedly in good condition, had been applied and had gripped the asphalt some 20 feet on the west side of the crossing, it is impossible to believe that Kemp's speed was not over 15 miles when he picked up Miss Norwood at the crossing.

Mr. Sawyer, who saw the collision, said that he estimated the truck was moving at 30 or 35 miles an hour at the time. Though such an estimate, standing alone, should not be accepted as an absolute criterion of the speed at which an auto is traveling, when, however, it is taken in connection with the corroborative and confirmatory proof of speed resulting from the appearance of the tracks of a truck extending over 40 feet on the pavement, the case here, it is amply sufficient to fix with moral certainty the approximate rapidity at which an auto is moving.

The district judge found that Kemp was undoubtedly traveling at the rate of 25 miles an hour in which we fully concur as this estimate is entirely supported by the facts and circumstances of record. In traveling at that rate of speed, knowing the conditions that existed around that crossing at the opening hour of school, Kemp was moving in utter disregard of the imperative duty which the circumstances of the situation and the law imposed upon him to have his "truck under full control" as is required in such instances, not only according to the rulings of our courts on this subject, but also by the generally accepted doctrine recognized by many other courts to which we do not deem it necessary to refer.

Instead of having his truck under control, he was driving at an excessive and reckless speed, considering the emergencies that he could have expected to encounter at any moment. He was therefore negligent, and not exercising ordinary care immediately before and when the collision occurred.

The trial judge applied the doctrine of the last clear chance holding defendant responsible.

In his brief on the question of the last clear chance, counsel for defendant says:

"When Miss Norwood got on the asphalt, defendant's car was only twenty feet away, and instantly upon seeing Miss Norwood on the asphalt and walking without looking the driver applied his brakes and did all in his power to stop the car."

In the foregoing statement of counsel, it is plainly stated that Miss Norwood had gotten on the asphalt, and was 20 feet away when the driver instantly applied his brakes. The driver, Kemp, says in his evidence that he collided with Miss Norwood at the crossing and carried her 20 feet beyond that point. Simms and Sawyer say about 22 feet. It is shown, and not contradicted in the slightest, that an auto going 15 miles an hour can be stopped at a distance ranging between 15 and 18 feet. If the driver had been going at 15 miles an hour, and which counsel positively asserts was the speed at which he was traveling (as it is shown that he had applied his brakes when 20 feet away from Miss Norwood), the car would have been stopped before it reached the crossing, and certainly as it got there, and no accident would have occurred. Instead of stopping there, which would unquestionably have been the case had the driver been driving at 15 miles an hour, the fact is he went 20 feet, according to his own admission, beyond that crossing where Miss Norwood fell from the truck, shown by traces of blood on the pavement where the truck finally stopped. If it were true that Kemp was going at 15 miles, we would have to believe that though he applied his brakes and did all in his power to stop that truck, he finally succeeded in stopping it only after he had skidded and gripped the pavement for a distance of at least 40 feet. It is simply impossible to so conclude in spite of the testimony which uncontradictorily shows that an auto mov-

ing at that speed can be stopped within the ultimate distance of 18 feet. There can be no doubt that Kemp was not traveling at any such moderate speed of 15 miles, which was the limit fixed in an ordinance of the town of Hammond. He was undoubtedly going at 25 miles or faster, which was at a wanton speed, considering the existing conditions. He, therefore, was grossly negligent, and was certainly not exercising ordinary care.

This brings us to the consideration of the last clear chance doctrine on which defendant was held liable.

Counsel cites several decisions from our courts and other courts on this subject. We will not review the several authorities cited by him, as they present the same familiar rule with only slight variation in the language used.

He refers to Roder v. Legendre, 147 La. 295, 84 So. 787, where the court held that the doctrine did not apply because no proof had been made to show a willful act of negligence by defendant, or his wanton disregard of the life and safety of plaintiff. And where the court also said:

"There is no evidence going to show that defendant had it in his power to have prevented the accident to Miss Germann after he discovered the danger of her position."

The last line being underscored in counsel's brief indicating special reference to it.

In Tyer v. Gulf, C. & S. F. R. Co., 143 La. 178, 78 So. 438, the doctrine is put in different verbiage, as follows:

"That plaintiff must clearly show that defendant after seeing the danger, could by the exercise of ordinary care, have avoided the injury."

Kemp testifies that when he saw Miss Norwood his truck was 1 foot from the crossing, or that he saw her about 2 feet before she was struck. According to him it was only then that he saw the "danger of her position," and he says that he instantly applied his brakes. It is probably true that it was only at that time that he discovered the perilous situation in which Miss Norwood had placed herself.

The question then naturally arises as to why the driver did not see Miss Norwood before he had reached the crossing.

The answer is because he had not brought his truck under full control as he was legally required to do. Because, it is plain, if he had, he could and would undoubtedly have seen Miss Norwood in time to stop his truck, as he had an unobstructed view ahead of him in Thomas street and across Orange street, both streets having a width of not less than 30 feet. Seeing her only when he got to the crossing was clearly the result of his own fault; his employer cannot escape liability on the specious plea that upon discovering her perilous position he had done all in his power to avert the collision.

In Tyer v. Gulf, C. & S. F. R. Co., 143 La. 178, 78 So. 438, the rule of the last clear chance is stated with more amplitude than appears in the other decisions quoted by counsel. The amplifying part to which we refer says:

"It must appear that plaintiff has clearly shown that defendant might by the exercise of ordinary care have seen the danger in time to avoid the injury."

As the driver did not have his truck under control at all, it is manifest that he was not exercising ordinary care; and, that if "he had he could have seen the danger in time to avoid the injury." It therefore clearly appears that if he failed to see the danger in time, it was entirely due to his failure to exercise the ordinary care which

was required of him under the circumstances. Any other interpretation of the last clear chance rule would render it valueless, otherwise the driver of an auto whose wanton or reckless driving had been the cause of his failure to see his victim in time would be excused on the theory that, when he first actually saw him or her, he was so close that it was a matter of utter impossibility for him to stop his car before the collision occurred.

The evidence shows that Sawyer, the driver of the school bus, had, on the morning of the accident, placed the bus on the south side of Thomas street, headed west, in the direction from which Kemp was coming in his truck. Counsel for defendant says Kemp's attention was riveted on the bus, prompted as he should have been by the fear that some child or children, with childish impulse, might run in the pathway of the truck and be killed or injured. His contention is that he was required to watch for the safety of these children by every law human and divine. The evidence shows beyond all cavil or question that hundreds of children, teachers, and others, every morning at the opening of that high school, about the time this accident happened, and to the knowledge of Kemp, invariably used the crossing where Miss Norwood was hurt, and which led from the north of Thomas street to the school grounds. What about the duty that devolved on Kemp in regard to these little children and others who Kemp knew used this footway every morning in large numbers? It is true, as counsel says, that Kemp was right in looking towards the bus first, but nothing in law or reason demanded that he should have had his attention riveted or fastened to that particular spot. He was, under the circumstances, equally bound to immediately look to his left as a necessary precaution which was required by the situation.

If he had been running at a reasonable speed, or had had his truck under control, as we have pointed out, there can be no doubt that by applying his brakes as he did, no collision would have occurred.

Kemp says also that there were two wooden braces, about five inches wide, which supported his windshield on both sides of the truck. He says this attachment to the sides of the windshield interfered with his view, and he advances that as one of the reasons why he did not see Miss Norwood before she had gotten about 3 feet on the asphalt pavement. Traveling at the speed he was going with his vision so obscured affords an additional reason in support of our conclusion that the district court correctly held defendant liable in damages for the reckless act of his employee.

## ON APPLICATION FOR REHEARING

MOUTON, J. In our original opinion (127 So. 475) we referred to Mequet v. Algiers Mfg. Co., 147 La. 364, 84 So. 904, where the court said that:

"The driver of an automotive vehicle on a public street must, at points provided for the passage of pedestrians, exercise a high degree of care to avoid accidents. etc."

In Duffy v. Hickey, 151 La. 274, 91 So. 733, the court said:

"It was an automobile driver's duty, when he approached a street crossing where people were constantly crossing, to have the automobile under full control, so that it could be stopped quickly in event of emergency, etc."

"At such points," the court said in Mequet v. Algiers Mfg. Co., 147 La. 364, 84 So. 904, 905, the pedestrians "have the right to assume that the operators of such machines would observe that high degree of care imposed by the circumstances."

"We do not mean by this," says the court, "that he is to be excused for failing to use his own senses to avoid being injured; but the greater duty and care rests upon those who use these dangerous agencies carrying such great possibilities of harm."

We did not say anywhere in our opinion that the plaintiff, in this case, could have relied altogether on this assumption of safety in going over the footway or passage on which she was injured, but we referred to the decisions above cited to show the exacting care which the law imposed upon Kemp, the driver of the car, as he approached that crossing.

In our original opinion we referred to the testimony of witnesses, and the physical facts of the case which, we said, unquestionably established the fact that Kemp was, when he approached the crossing, traveling at a rate of speed of not less than 25 miles an hour, and we therefore affirmed the finding of the district judge on that point.

It was shown that over five hundred children attended the school near where the accident occurred, and that one-third of that number, and also the general public, used that crossing every day. It was used to such an extent that a policeman had been asked to be placed at that crossing. Thomas street, that is crossed by it, is shown to be the main thoroughfare of Hammond. The accident, the record shows, happened at about the opening hour of that school, and in referring to the foregoing facts, we said:

"A dangerous situation existed there, imposing unusual care and caution on drivers of cars, autos, or trucks at the intersection of Thomas and Orange streets."

Then referring to Kemp, the driver of the truck, we said:

"Charles Kemp, the driver of the truck, passed that spot in his delivery wagon which he operated for defendant, many times every day, had besides been a pupil at that school, and was perfectly familiar with the conditions which existed there at the opening hour of school, and knew that a large number of children congregated in its vicinity and with others used the footway across Thomas street where his truck collided with Miss Norwood, plaintiff in this case, and one of his former teachers, at that institution."

The care and prudence required of the driver of an automotive vehicle necessarily increases when he is driving over a crossing or footway which he knows is being constantly used by pedestrians, and where he can expect an emergency at any moment; particularly is it so where, as in this case, a large number of children, including their teachers, and the general public, may be going over the crossing at the opening hour of a public school, situated near the main thoroughfare of a town or city.

No doubt that counsel for defendant realized that Kemp was required, under the circumstances, to exercise more than usual vigilance when he approached the footway on which plaintiff was injured. In reference to the position in which Kemp was placed at that time, counsel says that there was then a bus on the south side of Thomas street from which school children were getting out, presumably to go to the school building, and that Kemp had his eyes riveted to the bus for fear that some child or children might, with childish impulse, run in front of the truck, and be injured or killed. He says, by every law, human and divine, he was under the obligation of looking out for the safety of these children. But as we said in our original opinion, what about the duty that devolved on Kemp in regard to the little children, teachers, and others who Kemp knew used

this footway every morning in large numbers to reach the school? It was proper, we said, for Kemp to look towards the bus in the interest of the children that were getting down, but that neither law nor reason demanded that he should have his eyes fastened or riveted to that particular spot. He was unquestionably equally bound, under the circumstances, as we see it, to look to his left also, and ahead of him where he had an open view, before going over the crossing and footway. If Kemp had been driving in an open street where no such conditions existed, his speed of 25 miles or over could not of itself have been considered as wanton or excessive, but driving at that rate, at such a time, and such a place with which he was perfectly familiar, was, we find, to have been at an excessive and reckless speed.

This brings us to the application of the doctrine of last clear chance which was applied by us in the determination of this case.

Counsel for defendant has referred us to the general rule of the last clear chance doctrine which requires the person injured to prove, in order to recover, that defendant "after seeing the danger could by the exercise of ordinary care, have avoided the injury." This is the accepted rule in most all jurisdictions. Cyc. vol. 29, pp. 530, 531.

In referring to this generally adopted rule, Cyc. says:

"But in some other jurisdictions it.is extended to cases where defendant might have discovered the peril by the exercise of reasonable care or has neglected the most ordinary caution in failing to do so."

The latter part of that rule, above quoted, was practically adopted in this state in Tyer v. Gulf, C. & S. F. Ry. Co., 143 La. 178, 78 So. 438, where the court, after stating the generally accepted rule hereinabove cited, added the following:

"If defendant did not see the danger, it must appear that plaintiff has clearly shown that defendant might by the exercise of ordinary care have seen the danger in time to avoid the injury."

In our original opinion, we said that the rule of the last clear chance had been stated with more amplitude in Tyer v. Gulf, C. & S. F. Ry. Co., 143 La. 178, 78 So. 438, than in the other decisions on the subject, and we then applied the amplifying part of that rule, so recognized in Tyer v. Gulf, C. & S. F. Ry. Co., 143 La. 178, 78 So. 438, in the solution of the issues in this case.

It was clearly shown that Kemp was traveling at not less than 25 miles an hour, although the speed limit of the town of Hammond was fixed by ordinance at 15 miles. It therefore appears that not only was Kemp violating the speed limit of Hammond, but was for the reasons hereinabove given driving at a wanton and excessive speed due to the conditions existing there particularly at that time. It is therefore clearly shown by plaintiff that Kemp was not then "exercising ordinary care." If he had been exercising ordinary care, at the time, he would have been driving at a reasonable rate of speed, and, we think, would undoubtedly have seen Miss Norwood in time 'to avoid the collision. The proof is, and not contradicted, that an auto going at 15 miles an hour can be stopped within a distance of 15 or 18 feet. If Kemp had been traveling at that speed, which would have been within the rule of ordinary care, and as it is shown that he applied his brakes with all the force at his command, and at a distance of not less than 20 feet from the footway Miss Norwood was crossing, it is manifest that the truck would have come to a standstill before

reaching her, instead of picking her up; as it did, and carrying her more than 20 feet from the footway where traces of blood on the pavement indicated where she had fallen.

We found that under the application of the amplifying part of the doctrine of the last clear chance recognized in 143 La. 178, defendant was responsible in damages for the reckless act of Kemp, his employee. If we are not correct in thus applying that rule, though Kemp had been going at 40 or 50 miles an hour, he could, under the defense made herein, say: When I first saw Miss Norwood she was 20 feet from me, I immediately applied my brakes, did all in my power to stop the truck, but could not possibly do so, and my employer is therefore not liable in damages. If such is the doctrine of the last clear chance, it can well be dispensed with, as a party could not be held liable, under cases of this character, even when he happened to be the victim of the grossest negligence.

We have written an unpardonably long opinion on the application for a rehearing. We were forced to do so because counsel for applicant has evidently, as appears from his brief, misunderstood the purport of our original opinion. The blame is that of this writer, who obviously for lack of precision and clearness of language has failed to convey his meaning to learned counsel for defendant. We trust, however, that in this second effort our ruling has been clearly set out so that counsel may have no trouble in pointing out any errors on our part, if we have fallen into any, and obtain any relief to which his client may be entitled.

For the foregoing reasons, and those expressed in our original opinion, the rehearing applied for is denied.