No. 667

First Circuit

---

DOBROWOLSKI v. HENDERSON

---

(October 8, 1930.   Opinion and Decree.)
(December 1, 1930.   Rehearing Refused.)

---

C. A. Battle, of Baton Rouge, attorney for plaintiff, appellant.

D. J. Sanchez, of Baton Rouge, attorney for defendant, appellee.

LeBLANC, J. This is a damage suit in which the plaintiff, an elderly lady, 70 years old, seeks to recover for personal injuries sustained by her when she was struck by the defendant's automobile which he was driving through the business section on North Boulevard, in the city of Baton Rouge. The accident happened on the morning of May 13, 1929.

Shé alleges that she was standing out one or two feet from the sidewalk on the south side of North Boulevard street, when an automobile belonging to and being driven by the defendant, Joseph T. Henderson, with some tent poles fastened to the rear end and sticking out two or three feet beyond the sides, came by so close to where she was standing that the end of the poles struck her as the car passed, and knocked her down, injuring her to the extent that she will be a cripple for life. She alleges that the said poles carried no flag or sign to call attention to them, and were not otherwise noticeable to any one by whom said car might be passing. She charges the defendant with negligence in driving his car carelessly and recklessly near the sidewalk where she was standing, knowing that the said poles were so attached to his car as to create a situation of danger. She claims of the defendant damages in the sum of $586.26 for expenses and the additional sum of $500 for pain and suffering and for her injuries, making a total of $1,086.26.

The defendant denies all charges of negligence and pleads contributory negligence on the part of the plaintiff in the following particulars: That she was attempting to cross the street at a point 25 to 30 feet from the intersection; that she suddenly appeared on the street from between two automobiles which were parked alongside of the curb into the path of the automobile traffic on the street; and that she was not observing the proper lookout for approaching cars.

The district judge found in favor of the defendant and dismissed the plaintiff's suit. From his judgment, she has appealed.

North Boulevard street is one of the busy streets of the city of Baton Rouge. At the vicinity where this accident occurred, the intersecting streets do not run all the way across, but run into North Boulevard at intervening corners, one on the south side and the next on the north. Mrs. Dobrowolski had been to Brown's store, which is situated in the center of the block on the south side of North Boulevard, at a distance of approximately 35 or 40 feet from the point where North Twelfth street intersects it on the north side. The defendant was driving his automobile on North Boulevard, going in the direction from west to east.

The evidence discloses that the defendant is a member of the religious sect known as the Church of the Nazarene. He, with two ministers of his faith, were on their way to a place called Istrouma, where they were to conduct a religious meeting. They carried a large tent to be

used for that purpose, with them. The tent proper, that is, the canvas top and walls, were loaded in the car; part also being laid over and across the hood or front part of the automobile. The poles were tied in two bundles of about 12 poles to each bundle and they were securely fastened to the rear end of the car. These poles were 88 inches long and were arranged so as to make the projection on either side of the car as equal as possible. The car measured 66 inches in width, so we judge that they projected about 11 inches on each side.

We find a provision in the law regulating the operation of motor vehicles on the public highways to the effect that no passenger vehicle can carry any load extending beyond the line of the fender on the left side, nor more than six inches beyond the line of the fender on the right side. This provision is to be found in subsection (e) of section 38 of Act No. 296 of 1928. It would appear therefore that there was a violation of that section of the statute by the defendant, which the plaintiff, however, did not plead. Giving due consideration to its provisions, nevertheless, the only result of defendant's violation, as far as this case is concerned, was to create a presumption of negligence on his part, which, like all other presumptions in law, was subject to rebuttal by competent and proper proof. If it can be shown, by satisfactory and convincing proof, that the protruding object was not the cause of the accident, as was done in this case, the one charged with negligence in that particular should be discharged.

Plaintiff is the only witness who swears that she was struck by the poles attached to the defendant's car. As a matter of fact, from her own testimony on this point, we might infer that she is not so sure herself what it was that struck her. A witness by the name of Joseph H. Bowden, a minister of the Methodist Episcopal Church, South, testifies in her behalf, but admits that he did not see the actual blow which struck her. His conclusion that she was hit by the projecting poles is drawn from mere conjecturing on his part.

As against the character of proof offered by the plaintiff, we find the positive testimony of the defendant and of Rev. Le June and Rev. Watson, the two preachers who occupied the front seat of his car with him, that she was struck by the right front fender of the automobile as she emerged from between two cars parked along the sidewalk curb, and found herself suddenly in front of them. The physical facts would also seem to favor the defendant's and his witnesses' contention that she was struck by the front fender. According to the testimony of Rev. Bowden, she is a lady approximately five feet, six inches tall, and from our observation of the height of the front fender of a Chevrolet automobile of the model such as the defendant was driving, from the ground, she would have been struck just about at the hip, the very part that was injured. If the poles were fastened across the rear bumper of the car, as the evidence indicates they were, it seems as though she would have been struck lower than her hip. Mr. Bowden testifies that the poles were tied over and across the back fenders. Considering the curved formation of these fenders, it is difficult to understand how they could have been securely fastened over them, but granting they were, it would then appear that they were a bit high to have struck her on the hip.

After considering all the evidence and surrounding circumstances on this point, we find that not only has the plaintiff

failed to carry the burden of proof which the law imposed on her, but that the weight of the testimony seems to be with the defendant.

It is equally as certain to us that she has not shown the defendant guilty of any reckless or careless driving.

The attempt made to show that, because the tents were piled on the hood of the automobile, the driver was not in a position to see ahead of him, is met by the testimony of the defendant and that of the two ministers with him, who say that their vision was not a bit obscured for the reason that the bundle did not extend more than six inches above the surface of the hood itself.

According to their testimony, also, defendant was driving about ten feet from the curb on the south side of the street, which we believe made all necessary allowances for the cars that were parked along the curb on that side.

With regard to the rate of speed at which the defendant was going, the only direct testimony comes from him and his two witnesses, and the maximum stated by any is 15 miles per hour. Rev. Bowden surmises a far greater speed which he judges from the distance it took the defendant to bring his car to a full stop after he had struck the plaintiff. There is a difference of 50 per cent or more between his estimate of what that distance was and what the defendant and his witnesses say it was, so there is certainly nothing certain to guide us in that respect. Moreover, we find no good reason why we should accept his evidence on the question of the speed of the car, which, after all, is merely conjecture on his part, as against the positive proof of the other three witnesses.

A rate of speed of 15 miles per hour, even in congested traffic, will not be considered careless and reckless driving. At such speed, an automobile can be kept under control and handled to meet almost any reasonable emergency.

These are some of the considerations which strengthen our impression that the unfortunate victim of this accident is the one who created the perilous situation in which she found herself and was injured. She almost admitted as much after it happened. Not only did she suddenly appear on the street, directly in front of defendant's car, from between two automobiles parked along the curb, but the evidence also shows that in leaving she attempted to cross the street immediately in front of Brown's store, a distance of approximately 35 or 40 feet from the street intersection. And this, too, at a time in the morning when the traffic on the street was already heavy.

In so doing, she doubtless contributed by her own negligence to the accident and her injuries which resulted therefrom. For this, of course, she would be denied recovery even though it had been shown that the defendant was at fault in any way.

We find that the judgment of the lower court is correct, and it is hereby affirmed.

ELLIOTT, J. (dissenting). I cannot agree that the judgment appealed from should be affirmed. My conviction is that there should be judgment in favor of the plaintiff.

Defendant's companions were moved by a feeling quite natural, as strong as could have existed in the defendant, to excuse the driving and were naturally unwilling to concede that the ends of the tent poles they were carrying, sticking out beyond

the side of the car further than the law permits, injured the plaintiff. They declare that plaintiff stepped out in front of their car, from between cars, parked close together, and that she was so close to their car at the time that she could not be and was not seen in time to avoid striking her. These declarations, when examined, are but such. The further testimony of the same witnesses justifies the conclusion that plaintiff did not come into the street from between any cars, and if defendant had been driving with his car under control as he should have been when passing parked cars and looking carefully ahead, he would have been bound to have seen the plaintiff in time to have swerved and missed her.

They say that the ends of the tent poles did not strike plaintiff; that she was only brushed by the right front fender of their car as it passed her. These affirmative assertions are struck down by their own testimony that they could not see the ends of the poles from where they were sitting. One of them says he looked back but admits that he could not see the poles. As they could not see the poles, it is impossible for them to know whether they struck the plaintiff or not. Plaintiff was in a position to see what struck her. She says that she was struck and injured by something on the car as it passed her, and it could not have been anything else except the ends of the poles. Then there is some corroborating testimony which tends to support the plaintiff and nothing that should be regarded as convincing to the contrary.

Defendant and his companions speak of the position of the poles. They do not claim to have examined the poles after the accident, nor at any time after starting on the trip. Mr. Bowden did so, he says, and found the ends of the poles sticking out on the right side of the car from 2 to 2½ feet beyond the side.

There were 24 poles, and Mr. Bowden says the the pile was as high as the fender. He is the only witness who claims to have looked at the poles after the accident.

Plaintiff testifies as follows:

"Q. You stated that you were about two or three feet into the street when you were struck?

"A. Yes. I saw the car coming fast and I stepped aside; stepped nearer to the side walk.

"Q. When did you first see the car coming, before you got out into the street or after?

"A. I was in the street already when I saw the car coming. I saw the car coming fast and I stepped aside. I thought the car would pass me, but something was on the car that struck me.

"Q. Don't you remember that there were a number of cars parked along the curbing on the south side of North Boulevard in that vicinity on that morning?

"A. I never noticed how many cars were around me.

"Q. Weren't there a number of cars parked along the curbing on the south side of North Boulevard?

"A. I could not tell you that; I never noticed. When I am going, I look ahead of me; I don't look up and down the street. I just look to see where I am walking to keep out of danger. I don't go out there and stand up there and look in every direction to see if I see something coming. I got out there and I saw this car coming and I stepped aside.

"Q. Do you recall if there were cars parked on the south side of North Boulevard near the vicinity where you left the curb to cross the street?

"A. I can't say that.

"Q. Isn't it a fact that you came from between two cars into the street?

"A. No, I never was near a car until that car struck me.

"Q. I am not talking about any cars moving, I am talking about cars parked

along the south side of North Boulevard near Brown's store?

"A. I can't tell you anything like that.

"Q. But you still say that you were only two or three feet from the north curbing when you were struck, and that you did not come from between two parked automobiles out into the street?

"A. No. If there were any there, I don't know. I didn't see them and I never went between them."

Joseph H. Bowden, standing near the south side intersection of Twelfth street and about 40 or 50 feet east of the place where plaintiff was struck, did not see the accident, but heard the impact and looked around just as defendant's car stopped a little beyond him, and saw the men get out, run back, and pick plaintiff up. He says that after plaintiff was struck her feet must have been about six and her head about four feet from the sidewalk. That there were cars parked on the south side of North Boulevard at the time, but they were not close together. That there was not a single car between him and where she was lying, and he could plainly see her body lying in the street, from where he was standing. That there were some cars parked beyond where she was lying, but he did not know how close they were together. That it was impossible for plaintiff to have walked out between two cars; meaning, I take it, that there were no cars at the place between which to walk.

Joseph T. Henderson, defendant, owner and driver of the car, says that Messrs. Watson and Le June were both seated with him on the front seat of his car. That on the morning of the accident there were cars parked on the south side of North Boulevard back west from where plaintiff started; that he was driving something like eight or ten feet from the curb, far enough to miss the cars parked along the curbing; that he didn't see plaintiff until just as the car struck her. That the cars parked along the side of the curbing kept him from seeing her any sooner. He was right by her, when he first saw her and could not avoid striking her.

"Q. It has been testified that Mrs. Dobrowolski was about 5½ feet (meaning in height). Would that bundle have prevented you from seeing her in any way?

"A. No, sir. I saw her. I could see her when she stepped in front of the car. It was because the other cars were parked there. I was driving by the side of these cars that were parked there; she stepped out from behind the car in front of my car. I don't know which way the cars might have been parked, east or west, but anyway she came out. The best I remember there was a car opposite there and she came out from between the cars. There was a line of cars on this side.
* * *

"Q. Were they pretty close together?

"A. Ordinarily close together.

"Q. How wide was that space through which Mrs. Dobrowolski came?

"A. There was a car opposite from where she came out; I don't know what the distance was. I suppose it was something like 8 or 10 feet. There was a space in between the cars where she came out of something like 8 or 10 feet. I don't think there was room enough for a car to have pulled out. There were 4 or 5 cars on this side of where she came into the street, between me, the way I was traveling, and where she came into the street.

"Q. Could you see through the glasses of an ordinary car, if anybody was coming?

"A. No. They were parked up together. I was lined up by the side of them; driving about two feet of the line of cars. There were cars passing me and meeting me going to town. I was holding my side of the road. The cars were parked along there; so I was driving about 2 feet, about as close as I could drive reasonably, without interfering with the parked cars."

Mr. Le June says that there were cars parked on the south side of North Boulevard. "That plaintiff came out from be-

hind one of the cars that was parked, between two cars, somewhat from behind one of the cars. As we came to the car, she came from behind one of the cars. The first time I saw her was when she came from behind the car, rushing as though she wanted to cross the street, and she came nearly directly in front of the car." That she was not more than two feet or something like that when he first saw her, and that she was coming from behind the car and just rushed out. He estimates that defendant was driving at about 15 miles an hour; that the tent poles were extending out on either side of the car a foot or something like that, and that Mrs. Dobrowolski was out **about 10 or 12 feet** from the curbing at the time she was struck.

Mr. Watson says he was in the car with Mr. Henderson. Asked to state the circumstances under which the accident happened, he said:

"Yes. We were driving along a street in a business section and this old lady stepped out just ahead of us. There were cars parked along there and she stepped out just head of us as we were driving. She saw it. She would have been killed, I think, because there was no way for us to stop, as close as we were; and she saw it, and she stopped and turned and was barely hit. She stepped back. What I mean by saying, barely hit, is, that the car did not hit her full; it would have hit her full, but by her stepping back, that is the thing that saved her."

That when she stepped out from behind the cars, he estimated that she was probably 15 or 20 feet from the curbing, but admitted that he could not well estimate the distance; that cars parked along the side of the street prevented them from seeing plaintiff any sooner. That they could not see her until she came from behind the car. When she came from behind

the car she was in front of our car; that is, perhaps within a step.

"Q. I believe you stated just now that she saw the car and stepped back?

"A. Yes.

"Q. How far was the car from her, in your estimation, when she saw the car? You were looking directly at her?

"A. Yes. I would guess from 10 to 12 feet from her. I would not state that exactly, of course, but that would be my estimate."

He estimated that defendant was driving about 12 miles an hour at the time.

According to plaintiff, she must have been in open, plain view of defendant when she stepped out two or three feet (likely meaning two or three steps) from the sidewalk for the purpose of crossing the street, and seeing defendant's car coming, stepped back thinking it would pass her. She didn't notice any parked cars near where she was standing and didn't come out between any. Her testimony on the subject is supported by that of Mr. Bowden, according to whom there were no parked cars; between the place where he was standing, some 30 or 40 feet past, and the place where she fell, he could plainly see her lying on the street.

According to defendant the plaintiff did not come out from between cars parked close together.

"Q. How wide was that space through which Mrs. Dobrowolski came?

"A. There was a car opposite from where she came out; I don't know what the distance was. I suppose it was something like eight or ten feet. There was a space in between the cars where she came out, something like eight or ten feet. I don't think there was room enough for a car to have pulled out. There were four or five cars on this side of where she came into the street, between me, the way I was traveling and where she came into the street."

Defendant, in saying that there were cars "on this side of her," has reference to the west side, the direction from which he was coming. He had previously stated that there were cars parked west of where she came out, but does not say how close they were to the place.

Coming out of a space eight or ten feet wide is not like coming out from between cars parked close together. Mr. Watson practically says the same:

"Q. I believe you stated just now that she saw the car and stepped back?
"A. Yes.
"Q. How far was the car from her, in your estimation, when she saw the car? You were looking directly at her?
"A. Yes. I would guess from ten to twelve feet from her. I would not state that exactly, of course, but that would be my estimate."

A circumstance which indicates that plaintiff was not standing close to parked cars is that if defendant had been driving 12 or 15 miles an hour within two feet of cars parked close together and had brushed plaintiff with his right front fender in passing her, with such force as to cause her to fall to the ground, the effect of the brushing blow would have likely forced her southward and down under the ends of the parked cars; but there is nothing indicating that anything of that kind took place.

Taking the statements and the facts and circumstances which seem to guide to the proper conclusion, the conviction is created that if defendant had been looking ahead in the direction he was going, and driving with ordinary care and not faster than is claimed, he could and would have seen the plaintiff standing out on the side of the street ahead of him, in time to have easily swerved his car to the left sufficiently to have missed her entirely, and

that he would have missed her if it had not been for the projecting ends of the tent poles which he carried, sticking out from the right side of the rear end of his car, which caught her as they passed.

The plaintiff alleges and testifies that defendant's car did not strike her; that she was struck by the projecting ends of tent poles, as defendant passed her, which he knew were attached to the rear end of his automobile. That something on the car struck her and knocked her over. In another place she says: "I was in the street already when I saw the car coming. I saw the car coming fast and I stepped aside; I thought the car would pass me, but something was on the car that struck me." That the thing that struck her was hanging on the outside:

"Q. The car itself didn't strike you?
"A. No; it was the pole or something, I think they told me it was the tent that struck me; but it was something like a pole that struck me. It stunned me; I can't remember just what happened. It seemed it was something like a ladder."

Testifying in rebuttal, she said: "The side struck me; nothing in the front or back. It was something like a ladder."

Plaintiff is again supported by Mr. Bowden. He says that after plaintiff was struck, the car stopped and he looked it over carefully while defendant and the two men with him were taking her to the residence of her son. That it had on it a tent which rested on the fenders and also on the hood, in such a way that it was 12 or 18 inches higher than the hood.

That there were tent poles on the rear end perpendicular to the car, extending out on the right side at least 2½ feet. That he didn't know as to the left side, as he didn't go around to that side of the car. That he didn't go behind the car, but

that the tent poles were tied in a bundle and were above the back fender, high enough to strike about the hip. That the car went 60 or 70 feet after striking plaintiff.

Defendant said as a witness that he had tent poles across the rear end of his car; that a bundle was lying across the bumper. He says they were tied there with a wire; that the poles were about 7 feet and 4 inches long. That he divided their length as equally as he could in placing them on his car. That his car was 6½ feet wide. That the ends of the poles extended out about 11 or 12 inches on each side.

As for the tent, he says that it was being carried across his front fenders and on his running board, and extended over the hood. That it was about level with his hood and did not obstruct his front view, as claimed by Mr. Bowden, except, say, a foot and a half or two feet from the ground.

That plaintiff was struck by his right front fender, not a hard blow—just brushed her like. That she fell on all fours. That his car went 25 or 30 feet after striking her. That she told them, when they went back to help her up, that it could not be helped, etc. That she saw the car pass just ahead of him, and was looking ahead of her and not to her left, the direction from which he was coming, etc. That when they reached the residence of her son, she was asked by her daughter-in-law who was to blame, and she said: "Neither of us; it could not be helped. He could not help it, and I could not help it. I did not see his car, and he did not see me until it was too late."

Mr. Le June also says that plaintiff was struck by defendant's right front fender, the edge of it brushing her, and she fell on her hands. That the tent on the hood extended two or three inches above the hood, but did not obstruct the view. That there were two bundles of tent poles, 12 in each bundle, 24 in all. That the poles were evenly arranged, tied on tightly, the bundles resting on the back fender. That when they reached their destination, none of them had slipped out of the bundles. He corroborated defendant as to plaintiff's statements after reaching the residence of her son.

Mr. Le June testified that Mr. Henderson was driving, Mr. Watson was on the front seat next to him, and that he (Le June) was next to Watson. Mr. Watson says that plaintiff was struck by defendant's right front fender; the car hardly hit her, just brushed her. That it had passed her a distance which he estimated at .40 or 50 feet before she fell. That he was looking back and saw her fall. That Mr. Henderson was driving at about 12 miles an hour and went 40 or 50 feet after striking her. With reference to the tent poles, he testified that he had himself bound and fastened them across the back end of the car, but that the ends might have been sticking out about the length of a finger. That he was sitting on the right-hand side of the front seat:

"Q. Could you see from where you were sitting, the poles in the back?
"A. No, sir.
"Q. Could you swear that those poles did not hit her after she was brushed by the front of the car?
"A. Yes, because she was stepping back when it brushed her, and I was looking. I continued to watch; there was nothing struck her after the first brush.
"Q. You say you could not see those poles?
"A. No, but if they had been sticking out there where she was I would have seen them. If they had been sticking out 2½ feet, as the gentleman testified, it would

have been no trouble to have seen them. I could have turned my head and seen the poles."

Dr. Carroll Allen treated plaintiff for her injuries, describing them as, "Multiple contusions of pelvis and upper part of lower extremities, with fracture of acetabulum."

Plaintiff's injuries might possibly, I suppose, have been caused by a brushing blow of the fender as it passed her; but there was but one blow, and the character of the injury received would be just such as would seem to have been the natural result of a blow from the projecting ends of the tent poles. If the blow received had been from the fender, there would probably have been marks and dents on the fender. But there is nothing in the evidence about any signs of that kind.

Defendant and the two parties with him all say that plaintiff's hip did not go to the ground, consequently her injuries could only have been accomplished by a hard blow from a hard substance applied directly to the parts injured. And it is my conclusion that plaintiff must have been standing at the time, in front of the object which struck her.

Defendant says that when the tent poles were placed on the car, the ends projected out 11 or 12 inches beyond the sides of the car; but he does not claim to have examined the position of the poles after the accident.

Neither does Mr. Le June nor Mr. Watson claim to have examined the position of the poles after the accident; therefore none of them were in position to contradict the statements of Mr. Bowden, who says that he looked at the right-hand side of the car while defendant and the parties with him were gone with plaintiff to the

residence of her son, and that the ends of the poles were sticking out on the right-hand side about 2½ feet beyond the side of the car. I am satisfied that his statement is true.

Mr. Watson, sitting on the front seat in between Messrs. Henderson and Le June, could not and did not see the poles at the time plaintiff was struck; yet he, as well as Mr. Henderson and Le June, all put forward declarations that plaintiff was not hit by the projecting ends of the poles. Mr. Watson says he was looking back, but his explanation does not explain. Their declaration does not take into account the fact that Mr. Henderson, driving and seated on the left-hand side of the front end of the car, Mr. Watson sitting by him, had the body of the car in between them, and the ends of the poles. Mr. Le June, sitting on the right-hand side of the front seat, does not claim to have looked back. Mr. Watson's memory at the time of the trial, some eight months after the accident, did not enable him to remember for sure that Mr. Le June was with Mr. Henderson and himself in the car.

Their statements that the poles did not strike plaintiff is therefore but an opinion given, which under the circumstances I decline to accept as lessening the weight of the testimony of the plaintiff, that she was not struck by the car; but by something projecting out of it, and which I am satisfied was the tent poles carried by the defendant.

Defendant was driving a passenger vehicle, and the law provides that:

"No passenger vehicle shall carry any load extending beyond the line of the fender on the left side of such vehicle nor extending more than six inches beyond the line of the fender on the right side there-

of." Act No. 296 of 1928, sec. 38, subsec. (e).

The projecting ends of these tent poles at the rear end of defendant's automobile was a potential danger, hardly noticeable by any one toward whom the car was approaching. It may be that when first placed on his car, the ends did not project out on the right-hand side more than 11 or 12 inches; but even that projection was greater than the law permits, and constituted a danger to people in the street. But I am satisfied that the poles, as a result of defendant's neglect and want of care, were extending out on the right-hand side of the car at the time plaintiff was injured, about the distance stated by Mr. Bowden.

Plaintiff was not negligent for attempting to cross the street on foot at the place where she started to cross it, nor in any other way, that I can see.

And even if defendant did not see plaintiff in time to completely avoid her, he was at fault and responsible for her injuries, because he could and would have seen her had he been looking ahead in the exercise of ordinary care for people on foot in the street ahead of him in the direction he was driving. Hearn v. R. R. Co., 34 La. Ann. 160; Gallaher v. R. R. Co., 37 La. Ann. 288; Barnes v. R. R. Co., 47 La. Ann. 1219, 17 So. 782, 49 Am. St. Rep. 400; Tyer v. R. R. Co., 143 La. 178, 78 So. 438; Norwood v. Bahm, 14 La. App. 261, 127 So. 475.

And it is my further conclusion that plaintiff received her injuries by being struck and knocked down by the projecting ends of tent poles carried by defendant on his automobile, as she stood on the street, after she had stepped back out of the pathway of the car, except for the projecting ends of the poles carried on the rear end of the same.

With reference to the extenuating and excusing statements made by the plaintiff in response to questions asked her by her daughter-in-law, as to how she came to get hurt, when carried into her son's residence, a short distance from the scene of the accident in the presence of the defendant and the two friends with him at the time, plaintiff testifies that she did not remember making the statements imputed to her, and considering her age, physical and mental condition which must have been at the time, her statement seems reasonable to me.

Suppose her to have made the statements which she is said to have made, her condition at the time must be taken into account. There is nothing said about her condition at the time, but it would be unreasonable to suppose that she was otherwise than in a state of mental confusion and unable to say who was at fault or to place the responsibility on defendant or on herself. It seems to me that about all that should be concluded from what she is claimed to have said is that she did not blame the defendant any more than herself and bore him no ill will, but would excuse him from all blame in the matter. That, however, did not give defendant a release from legal responsibility if he was in fact responsible.

Her answers on the trial seem to me to have the impulse of truth, and the same together with the testimony of the defendant and the parties with him and the other testimony in the case satisfies me that the defendant is legally responsible and should be required to make the proper amends as far as he reasonably can. I think the judgment should be reversed, and that there should be judgment in fa-

vor of the plaintiff for a reasonable amount, making good the damages she has sustained and expenses to which she has been placed as well as can be done.

For the foregoing reasons I respectfully dissent.